Philip D. QUILLEN, Appellant–
Respondent,

v.

Linda J. QUILLEN, Appellee–Petitioner.

No. 29A02–9410–CV–648.

Court of Appeals of Indiana.

Dec. 11, 1995.

Rehearing Denied Feb. 6, 1996.

---

Maureen E. Gaddy, Gaddy & Gaddy, Indianapolis, for appellant.

E. Davis Coots, James D. Crum, Coots, Henke & Wheeler, Carmel, for appellee.

## OPINION

KIRSCH, Judge.

Philip D. Quillen appeals the trial court's judgment dissolving his marriage to Linda J. Quillen (Jean). He raises the following issues:

1. Whether the trial court abused its discretion in dividing the marital property.

2. Whether the trial court erred by ordering Philip to pay certain extraordinary expenses related to the children and incurred while a preliminary support order was in effect.

3. Whether the trial court abused its discretion in failing to find the parties' daughters emancipated.

4. Whether the trial court erred by setting aside a portion of the marital property to be held in a trust fund for the children's counseling and educational expenses.

5. Whether the trial court erred by ordering Philip to pay $40,000 toward Jean's attorney fees.

6. Whether the trial court impermissibly relied on fault when dividing the marital property and allocating expenses.

## FACTS AND PROCEDURAL HISTORY

After more than twenty years of marriage, Jean filed a dissolution petition on September 24, 1992. The couple had three children during the marriage: Sean, born on August 8, 1973, and twin daughters, Chaucie and Brandy, born on September 3, 1974. The trial court found that Sean was emancipated. Three days' prior to the filing of the dissolution petition, Philip was arrested on allegations that he committed various sex offenses with one of the parties' daughters. Prior to the final hearing in this action, Philip was tried on the criminal charges. A two-week jury trial ended in a hung jury, and retrial was scheduled after the final hearing in the dissolution proceeding.

After conducting a final hearing, the trial court entered findings of fact and conclusions and a decree of dissolution. The court valued the entire marital estate at $1,561,828.17. The largest marital asset was an escrow account which contained proceeds from the sale of the parties' real property during the pendency of the dissolution proceedings, and additional cash. The sole source of the parties' employment income was Quillen Construction, Inc., their jointly owned business. Philip was primarily responsible for the physical operation of the home construction business, and Jean was primarily responsible for the office operations, banking and financial management. The court valued the business at $328,000.

After concluding that an equal division of the marital property would be just and reasonable, the trial court first set aside $582,298.35 to Jean and $582,298.41 to Philip. The trial court then determined that the $397,231.51 balance in the escrow account should be disbursed as follows: first, to fund a trust established for a contingent tax liability on the sale of the marital home ($135,000); second, to fund a trust established for Brandy and Chaucie's educational and counseling expenses ($80,000); and third, to achieve an equal division of the marital property, a basic distribution to Jean of $41,762.86, leaving an escrow balance of $140,468.65. The trial court further concluded that:

> "The escrow balance of $140,468.65 ± should then be divided equally between the parties. The Husband's share of $70,234.36 ± should first be distributed from the escrow account in direct payment to Wife to satisfy the obligations set out in ... the Findings in an amount of $21,988.60. A direct payment of $40,000 should then be made to Wife's attorney.... The remaining balance of $8,245.77 ± shall then be paid to Husband."

*Record* at 342–43.[1]

## DISCUSSION AND DECISION

### I. PROPERTY DIVISION

■ The division of marital property is governed by IC 31–1–11.5–11(c) (1993 Ed.), which imposes a rebuttable presumption that an equal division of the property is just and reasonable. Subject to this presumption, disposition of marital property is committed to the sound discretion of the trial court. *Livingston v. Livingston* (1992), Ind.App., 583 N.E.2d 1225, 1227, *trans. denied.* The trial court's decision is reviewable only for an abuse of discretion which occurs when the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable and actual deductions to be drawn therefrom. *Qazi v. Qazi* (1989), Ind.App., 546 N.E.2d 866, 873, *trans. denied.* When reviewing the trial court's decision, this court considers only the evidence most favorable to the judgment, *R.E.G. v. L.M.G.* (1991), Ind.App., 571 N.E.2d 298, 300, and presumes the trial court divided the property correctly unless evidence to the contrary is presented. *Benda v. Benda* (1990), Ind.App., 553 N.E.2d 159, 164, *trans. denied.*

### A. Business Valuation

■ Philip first contends that the trial court abused its discretion when it valued Quillen Construction. The valuation of marital assets, like the division of marital property, is committed to the trial court's sound discretion. *Berger v. Berger* (1995), Ind. App., 648 N.E.2d 378, 382. The valuation, like the division, will be reversed for an abuse of discretion only if the valuation is clearly against the logic and effect of the facts and circumstances before the court. *Cleary v. Cleary* (1991), Ind.App., 582 N.E.2d 851, 852. When exercising its discretion, the trial court may select any date between final

separation and the final hearing to value marital property. *Eyler v. Eyler* (1986), Ind., 492 N.E.2d 1071, 1074. The trial court's choice of valuation date must accomplish a just and reasonable division of the marital property given the circumstances. *Taylor v. Taylor* (1982), Ind., 436 N.E.2d 56, 59.

R. James Alerding, a certified public accountant with experience in valuing businesses, testified as an expert witness on Jean's behalf. In valuing Quillen Construction, Alerding reviewed financial statements, tax returns, corporate bylaws, articles of incorporation, corporate minutes, documents related to work in process, and a questionnaire completed by Jean. He also reviewed his file from a valuation of Quillen Construction made in 1989 based upon information provided by both parties. Alerding valued the business as a "going concern" or as if the business would continue in operation.

Alerding assigned Quillen Construction a fair market value of $328,000. This figure consisted of $174,000 in net tangible assets with the remainder reflecting going concern value or goodwill. Alerding explained that it would be advantageous for someone buying the company to continue operating the business using the Quillen Construction name, the advantage being "the name, the reputation of the name and as a quality builder." *Record* at 529.

Alerding used a valuation date of September 22, 1992. This date was two days prior to the filing of the petition for dissolution and one day after Philip's arrest. Alerding acknowledged that as of this date, Philip had been arrested and was incarcerated. As to how Philip's arrest and incarceration affected the business valuation, Alerding testified as follows:

"It would be difficult to tell what impact it may have had on the business at that point in time. You know, subsequent events

---

1. We remind appellant's counsel and all appellate counsel of the requirements of Ind.Appellate Rule 7.2(A)(3)(a) which provides that: "Notations shall be made on the margin of *each page* of the transcript of the evidence *indicating the name of each witness, and whether the examination is direct, cross, or redirect.*" (Emphasis added). The marginal notations in the record before us

are inadequate. A note is made only on the first page of a witnesses' testimony, identifying the witness and the stage of examination. The notations made on a mere fraction of the hundreds of pages remaining in the nine-volume record do nothing more than identify the introduction of evidentiary exhibits, and note counsel's objections and the court's rulings thereon.

would have determined it. If you were sitting there ... at that date it would be very difficult to determine what impact it might have on the business."

*Record* at 481–82. Alerding's valuation was "based on the fact that it [the arrest and incarceration] would have not affected the business." *Record* at 508.

Alerding assigned a marketability discount figure of twenty-five percent. Marketability discount is a percentage reduction in the value of the business to account for negative factors associated with the company. Alerding's marketability discount figure did not account for the criminal charges brought against Philip. Alerding recognized that had he accounted for that circumstance, the marketability discount percentage could have been much higher.

For purposes of his valuation, Alerding assumed that Quillen Construction was able to obtain financing for its business operations through bank loans and a general line of credit. He "had no indication that they couldn't get financing." *Record* at 496.

Darrel Martin also testified at the dissolution hearing. Martin was an executive with the bank that provided the Quillens with a line of credit to finance the operation of Quillen Construction. Neither Philip nor Jean sought renewal of the line of credit following the filing of the dissolution petition. Both parties questioned Martin concerning the possibility of renewal had it been sought. Martin testified that Philip's incarceration alone could have prevented renewal of the Quillens' line of credit. He explained:

> "Well, Phil was the builder so we look at Phil as being the pay master or having the ability to generate the income to be our pay master. Our prime resource of pay master. And so if he was incarcerated our primary source of pay back would be eliminated."

*Record* at 1668. Martin admitted that the fact that Philip was released from jail on bond did not prevent Philip from continuing as primary pay master and "would not have automatically ended any opportunity to renew the line of credit." *Record* at 1668. Despite Philip's conditional release from jail, however, Martin acknowledged the continu-

ing negative effect on the ability to get financing. He testified:

> "Well, our line of credit on a residential builder, for example in this case, is Phil building homes. If Phil was incarcerated and not able to build homes we would probably not be interested in extending the line of credit to him or to anyone else."

*Record* at 1683. Martin clarified this testimony by acknowledging that it included the threat of incarceration.

Martin also testified that had Philip tried to obtain a line of credit to continue building homes following the filing of the dissolution and his incarceration, Martin "would probably not have recommended that loan for approval with those impending charges." *Record* at 1686. Martin also testified regarding the possibility of Philip obtaining a "spec" loan as an alternative method of financing:

> "Q Okay. Now in Phil's situation with the criminal case, twenty-five counts of molest pending against you that would apply a factor would it not as to whether or not he would get even a spec loan because you wouldn't know if he'd ever get to finish the house?
>
> "A That is correct.
>
> "Q And based upon that being the situation, you know, what has been the situation since the divorce has been filed and since September the 21st, would it still be your testimony that you wouldn't be able to recommend his [sic] for a spec loan under those circumstances?
>
> "A Yes.
>
> "Q So the reputation of the builder would have something to do with being able to get a spec loan?
>
> "A Yes."

*Record* at 1692–93.

■ The trial court made the following finding regarding the value of the marital business:

> "9. Quillen Construction, Inc. is an Indiana Corporation engaged in the business of single-family residential construction and had a net value of $328,000.00 on or about the date of separation (Exhibit 22

and testimony of Mr. Allerding [sic]). Husband has voluntarily elected to cease operating Quillen Construction. Instead, Husband has assisted the parties' son, Sean, in establishing an identical business. Husband works with or assists son in operating the business and son provides financial support to Husband as Husband requires in lieu of the payment of salary. Son's operation of the single-family residential construction business known as Naples 38, Inc. is a successor-in-interest to Quillen Construction, Inc. in that personal property owned by Quillen Construction, Inc. is used in the operation of the business of Naples 38, Inc.. Husband provides assistance, guidance and physical labor to Naples 38, Inc. as well as experience in dealing with members of building trades and real estate developers."

*Record* at 329–30. While the trial court stated the valuation date as "on or about the date of separation," the court's valuation was based solely on Alerding's testimony and valuation report. Alerding's conclusions were based upon a valuation date of September 22, 1992, a date prior to the filing of the dissolution petition on September 24, 1992. Alerding admitted that his valuation did not consider or account for any negative effects Philip's arrest and incarceration might have had on the value of the business.

Under the circumstances of this case, the trial court's decision to value Quillen Construction on or about the date of separation did not further a just and reasonable division of marital property, and, thus, was an abuse of discretion. The trial court selected a valuation date that reflected the business's value as if it was still intact with both principals, Jean and Phil, still involved in the operations. The trial court's value did not account for the departure of one or both principals from the company and did not account for the fact that Philip's arrest and incarceration would have a negative effect on the value of the business as acknowledged by Jean's expert.

Furthermore, goodwill constituted a significant portion of Alerding's value, as adopted by the trial court. This court has determined that goodwill "may be included in the marital estate for purposes of property distribution pursuant to a dissolution decree." *Porter v. Porter* (1988), Ind.App., 526 N.E.2d 219, 225, *trans. denied.* We have defined goodwill as:

"[T]he probability that old customers of the firm will resort to the old place of business where it is well-established, well-known, and enjoys the fixed and favorable consideration of its customers. *Lawlis v. Kightlinger & Gray* (1990), Ind.App., 562 N.E.2d 435, 442, *reh'g denied, trans. denied.* More succinctly stated, goodwill is the expectation of continued public patronage. *Cleary,* [582 N.E.2d at 853]."

*Berger,* 648 N.E.2d at 383. So long as Philip was either incarcerated, or under the threat of incarceration, which he was during the pendency of the entire proceedings before the trial court, financing for Quillen Construction was unavailable. Without financing, the business could not operate and the expectation of continued public patronage with Quillen Construction would be eliminated.

We recognize that the trial court has wide discretion in selecting a valuation date. *See Eyler,* 492 N.E.2d at 1074. Proper exercise of that discretion, however, requires that the valuation date have some relation to the true value of the asset. For example, in *Staller v. Staller* (1991), Ind.App., 570 N.E.2d 1328, this court found no error in a trial court's valuation of an asset as of the final hearing date to account for a $23,600 increase in the asset's value during the pendency of the dissolution petition. More recently, this court found no abuse of discretion in the trial court's valuation of a jointly-owned business that substantially decreased in value during the pendency of the dissolution petition. *Showalter v. Brubaker* (1995), Ind.App., 650 N.E.2d 693 (trial court properly selected appraisal of business that reflected approximately $230,000 decrease in business's value and which accounted for decline in market receipts, change in market demands, and lack of continuity of management occasioned by wife's departure from business). This court has never upheld an asset valuation that completely ignores factors which, as admitted by the supporting valuation expert, would have a negative ef-

fect on the asset's value. *See Taylor,* 436 N.E.2d at 58–59 (trial court's choice of valuation date must further a just and reasonable property division *under the circumstances* ) (emphasis added).

Here, the trial court's valuation of Quillen Construction ignored the circumstances before it. Those circumstances revealed that the value of the business changed substantially in the eighteen months between the filing of the dissolution petition, the date on which the business was valued, and the final hearing. This was due in large part because Philip was incarcerated for a portion of that time and financing could not have been obtained to further the business. As Alerding stated, the value of the business would have been reduced had he accounted for the criminal charges brought against Philip.

■ We hold that where, as here, the value of a marital asset changes radically between the date of final separation and the final hearing, it is an abuse of the trial court's discretion to select a valuation date that does not account for the events contributing to that change. We remand this matter to the trial court with instructions to revalue Quillen Construction in accordance with this opinion. The trial court is also directed to adjust the property division to achieve an equal distribution which accounts for the revised value of the business.[2]

### B. Successor in Interest

■ Philip also contends the trial court erroneously determined that Sean's company, Naples 38, Inc., is a successor in interest to Quillen Construction. "A successor, with reference to corporations, 'generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of first corporation.'" *Markham v. Prutsman Mirror Co.* (1991), Ind.App., 565 N.E.2d 385, 386–87 (quoting *Black's Law Dictionary* 1283 (5th ed. 1979)). A purchaser of corporate assets may also be considered a corporate successor when the purchaser is merely a continuation of the seller. *Markham,* 565 N.E.2d at 387.

■ The trial court's findings in the present case do not support the conclusion that Naples 38 was a successor in interest to Quillen Construction for purposes of this dissolution. The trial court's determination was based on the fact that "personal property owned by Quillen Construction, Inc. is used in the operation of the business of Naples 38, Inc." *Record* at 330. The court also noted that Philip worked with and assisted his son in the operation of Naples 38, Inc. and provided his "experience in dealing with members of building trades and real estate developers." *Record* at 330. None of these circumstances establish any amalgamation, consolidation or other legal succession between Quillen Construction and Naples 38. There is nothing in the trial court's findings to establish that Naples 38 became invested with the rights of Quillen Construction or assumed any of its burdens. The trial court erred in finding that Naples 38 is a successor in interest to Quillen Construction for purposes of this dissolution.

### C. Failure to Include Assets

Philip next contends the trial court failed to include the following assets in the property division: 1) $76,000 in funds from Quillen Construction that Jean used to pay expenses during Philip's incarceration; 2) $40,000 in Jean's money market account at the time the dissolution petition was filed; and 3) $1,855.17 in Jean's business account as of October 31, 1992. Jean contends that if $76,000 in cash existed to pay expenses, then that amount is set off by $76,000 worth of debt not accounted for. Jean does not respond to items two and three.

The record reflects that during Philip's incarceration and the pendency of the dissolution, Jean paid expenses related to Quillen Construction. Quillen Construction had two building contracts that required payment to subcontractors and suppliers. Jean testified that she paid these expenses. Philip did not contradict Jean's testimony that she used the

---

**2.** Neither party contests the trial court's determination that an equal distribution of the marital property is just and reasonable.

marital funds to make corporate expenditures for the marital business. In fact, pursuant to Philip's Exhibit A–14, the expenses paid out of Quillen Construction funds for three building lots and "other related expenses paid after September 30th, 1992" totaled $101,616.67.

■ Money used to satisfy marital debts prior to dissolution, absent proof of asset dissipation, is not marital property subject to division. *See* IC 31–1–11.5–11(b) (1993 Ed.). The $76,000 Jean used to satisfy marital debts pending dissolution was not marital property and was not eligible for inclusion in the marital estate. As for the two accounts in Jean's name, we cannot determine on the state of the present record whether those accounts should have been included as marital assets. Philip presented documentation concerning Jean's business account, *Record* at 1503, and cross-examined Jean concerning the existence of a Liquid Green Account. *Record* at 1262–63.[3] Neither party included the accounts in their proposed property division submitted to the trial court. Similarly, the trial court made no findings concerning these accounts. On remand, the trial court is directed to make appropriate findings and any necessary disposition of the accounts.

### D. Tax Consequences

Philip next contends the trial court erred by ordering $135,000 set aside in a trust account to fund any capital gains tax that might become due as a result of the pre-dissolution sale of the marital residence. Jean does not respond to Philip's argument. The trial court made the following findings with respect to the parties' potential tax liability:

"24. The sale of the parties' residence in August, 1993, will result in federal and state taxes if the parties do not comply with the reinvestment requirements of the Internal Revenue Code. Neither party is presently in compliance.

"25. The estimated capital gains tax due on the sale of the marital residence is approximately $135,000.00.

"26. Due to the contingent nature of the potential tax liability on the sale of the marital residence, the parties shall each pay $67,500.00 into a trust account with E. Davis Coots named as Trustee which shall be released to the party providing proof of timely compliance with the reinvestment requirements of the Internal Revenue Code, or paid to the respective taxing authorities if compliance is not timely. The funds currently in escrow shall be used to establish the trust account."

*Record* at 336.

The reinvestment requirement to which the trial court referred is found at section 1034(a) of the Internal Revenue Code. Under that section, taxpayers may defer the recognition of any gain on the sale of their principal residence so long as they purchase a new residence within a certain time period. If a married couple sells their jointly owned home and dissolves their marriage prior to the expiration of the reinvestment time period, they are required to individually purchase a new residence with their share of the proceeds from the sale of the marital home. Rev.Rul. 74–250, 1974–1 C.B. 202. If reinvestment fails to occur, or reinvestment occurs, but in a sum less than the amount of proceeds from the sale of the marital residence, then the gain must be realized and the appropriate tax paid.

■ The propriety of the trial court's treatment of the capital gains tax issue turns upon whether Philip and Jean are jointly and severally liable for any tax due. If Philip and Jean filed a joint tax return for the 1993 tax year, which is the year in which the marital residence was sold, then they will be jointly and severally liable for any tax due on the gain. *See Murphy v. Commissioner,* 103 T.C. 111, No. 8, 1994 WL 397309 (1994). In this event, it was entirely appropriate for the trial court to make allowances for the protection of each party should the other fail to reinvest and cause a tax to become due. If, however, Philip and Jean did not file jointly in 1993, there will be no joint and several

---

**3.** Philip provides no record citation to support his contention that the balance in Jean's money market account was $40,000. Our review of the record reveals no testimony or documentation concerning the balance of the account.

liability, and each party is free to choose whether to reinvest or to pay any tax. Under this circumstance, it would be an abuse of the trial court's discretion to order funds escrowed to cover any potential tax liability when the actions of one spouse would not result in any tax liability to the other.

The present state of the record precludes a resolution of this issue because the parties' 1993 tax returns are not included. Therefore, it is not possible to determine whether joint and several tax liability exists. We remand this issue to the trial court to determine whether the parties are jointly and severally liable for any 1993 taxes. If they are, then the trial court's findings and conclusions on the issue are affirmed. If there is no joint and several tax liability, then the trial court's findings and conclusions must be reversed.

## II. ALLOCATION OF EXPENSES

Philip next contends the trial court erred by ordering him to reimburse Jean for expenses related to the children and incurred while the dissolution petition was pending. With respect to these expenses, the trial court found that:

"10. During the pendency of this action, Wife paid $5,061.57 from her separate funds for Chaucie's and Brandy's education and extracurricular activities commonly associated with high school and the first year of college.... Husband should reimburse Wife for one-half of this amount, $2,530.78.

. . . .

"12. During the pendency of this action, Wife expended $11,782.00 from her separate funds for the children's health care.... Husband should reimburse Wife for one-half of this amount, $5,891.00."

*Record* at 330. Philip argues he should not be responsible for paying any portion of these expenses because they were incurred while a preliminary order was in effect that contained provisions ordering him to pay child support. He contends he should not be required to pay the extraordinary educational expenses because the child support order

did not require it. He further contends he should not have to pay the medical expenses because they exceeded the "six percent rule" set forth in the Indiana Child Support Guidelines.

■■■■ It is permissible for the trial court to credit a spouse for voluntary payments of marital obligations made during the pendency of a dissolution petition. *Fiste v. Fiste* (1994), Ind.App., 627 N.E.2d 1368, 1372; *Herron v. Herron* (1983), Ind.App., 457 N.E.2d 564, 567–68. *But see Maloblocki v. Maloblocki* (1995), Ind.App., 646 N.E.2d 358, 363–64 (trial court may not base an unequal division of marital property on the fact that father paid child support during pendency of dissolution). Here, Jean voluntarily paid certain expenses of the marriage for which she was entitled to reimbursement from Philip. The preliminary order did not preclude apportionment of the expenses at the final hearing. It was appropriate to require Philip to assist with payment of these expenses prior to the final adjudication of whether he would be required to pay extraordinary educational expenses and uninsured medical expenses pursuant to the final decree.

## III. EMANCIPATION

Next, Philip contends the trial court erred in failing to find Chaucie and Brandy were emancipated. The trial court made the following finding on this issue:

"29. The daughters of the parties have completed high school. They are not living with either parent. Both daughters are employed either full or part-time. Wife's request for weekly child support payments is denied. Both daughters have on-going counseling needs related to victim abuse ... and post traumatic stress syndrome...."

*Record* at 337–38. Philip argues that this finding "is, absent disability, insufficient for these children to retain the status of minors." *Appellant's Brief* at 60.[4]

■■■■ The duty to pay child support ceases when a child reaches twenty-one

---

4. Philip petitioned for and was granted permission to exceed the fifty-page limit for appellate briefs. *See* Ind.Appellate Rule 8.2(A)(4).

years of age unless the child becomes emancipated before that time. IC 31-1-11.5-12 (1993 Ed.). For these purposes, a child is emancipated if the child has joined the armed services, has married, or "is not under the care or control of: (A) either parent; or (B) an individual or agency approved by the court[.]" IC 31-1-11.5-12(e) (1993 Ed.). What constitutes emancipation is a question of law, while whether an emancipation has occurred is a question of fact. *Taylor v. Chaffin* (1990), Ind.App., 558 N.E.2d 879, 882. Emancipation cannot be presumed, but must be established by competent evidence. *Free v. Free* (1991), Ind.App., 581 N.E.2d 996, 997. The party seeking emancipation bears the burden of proving that the child is emancipated. *Id.*

Philip encourages this court to find emancipation by focusing on the children's relationship with their parents. He cites *Green v. Green* (1983), Ind.App., 447 N.E.2d 605, 609, *trans. denied. Green,* however, addressed whether a child's marriage was an emancipating event prior to the 1983 amendment to IC 31-1-11.5-12(e) which so provided. The change in relationship discussed in *Green* was a result of the child's marriage. Here, however, neither daughter was married.

■ To determine whether a child has placed herself beyond the control, custody and care of either parent, we consider whether the child is in fact supporting herself without the assistance of her parents. *Young v. Young* (1995), Ind.App., 654 N.E.2d 880, 883. The testimony in the present case established that both Brandy and Chaucie were living away from their mother, but that such arrangements were temporary. Jean asked Brandy not to live with her because Jean thought Brandy needed to grow up. Brandy was living with her grandmother, and Chaucie was living with a friend. Jean gave Chaucie money every month "because [Chaucie] can't make it on her own." *Record* at 676. Jean did not pay any of Brandy's living expenses, but paid both girls' medical expenses. Jean also paid for Chaucie's clothing. Jean paid the girls' educational expenses, both high school and college. Both girls had attended college. Neither daughter was enrolled in school at the time of the final hearing, but both had plans to return. Both Chaucie and Brandy were working at least part-time. Quillen Construction, and later Jean, maintained the girls' health insurance.

■ Evidence that tends to establish a child's independence does not necessarily establish emancipation. *Taylor,* 558 N.E.2d at 883. Here, Chaucie and Brandy undoubtedly were exercising a degree of independence, but their parents paid a substantial amount of money for the girls' medical and educational expenses. Although neither child was enrolled in school at the time of the hearing, both had plans to return at their parents' expense. Chaucie and Brandy's independent living arrangements were temporary. In short, there was no evidence presented that either child was in fact supporting herself without assistance from her parents such that either child was beyond the care, custody and control of her parents. The record is sufficient to support the conclusion that the girls are not emancipated.

## IV. ESTABLISHMENT OF TRUST TO FUND CHILDREN'S EDUCATIONAL AND MEDICAL EXPENSES

■ Philip next contends the trial court erred in establishing a trust for the payment of future counseling and educational expenses for Chaucie and Brandy. In this regard, the trial court found:

"30. Both daughters, Chaucie and Brandy, have interrupted their high school and college educations primarily due to the stress and time requirements relating to the Husband's criminal trial in which the daughters are chief witnesses. Therefore, the parties should assist in their daughters' education toward a bachelor's degree or post-high school vocational training if it is sought within four (4) years following the resolution of Husband's pending charges. Said contribution shall be one-half payment by each parent for all "educational expenses" including tuition, fees, books, room and board, laboratory fees and other assessed school expenses, less any loans, grants or scholarships available to them.

"31. Husband is currently awaiting trial on twenty-five (25) counts involving child molestation, rape, incest and criminal deviate conduct charges which may result in Husband's incarceration if convicted.

"32. In order to assure that funds are available for the counseling and educational expenses of the daughters following the resolution of the criminal case, a portion of the marital property should be set aside from the escrow funds representing a fifty percent (50%) contribution by each parent to said expenses.

"33. The escrowed proceeds shall be used to fund a trust for Brandy Quillen and a trust for Chaucie Quillen in the amount of $40,000.00 in each trust. The trust funds and accumulated interest shall be used for counseling expenses and educational expenses for each child for a period of four years following the resolution of Husband's pending charges."

*Record* at 338–39.

We find no merit in Philip's contention that the trial court's order "was entered without statutory authority and contradicts Indiana case law on the issuance of such orders." *Appellant's Brief* at 61. A trial court is statutorily authorized to order the establishment of a trust to ensure payment of expenses related to the children. IC 31–1–11.5–14 (1993 Ed.); *Schueneman v. Schueneman* (1992), Ind.App., 591 N.E.2d 603, 610.

Philip also challenges the factual basis underlying the determination that the education and medical expenses were necessary in the first instance. He contends the expenses should not have been awarded in the absence of a determination that the children had the aptitude and ability to pursue a college education, that the parents had the ability to pay for it, and that the children suffered from some disability warranting the counseling expenses.

 The trial court has the discretionary authority to order one or both parents to contribute toward their child's education expenses. IC 31–1–11.5–12; *Neudecker v. Neudecker* (1991), Ind., 577 N.E.2d 960, 961. An order directing the payment of education expenses will not be reversed absent a clear showing of abuse of discretion. *Sterrett v. Hartzell* (1994), Ind.App., 640 N.E.2d 74, 78. When deciding whether to order the payment of education expenses, "the trial court must examine the facts and circumstances of each case and determine if the expenses are reasonable and necessary." *Id.* Education expense orders hinge on a review of the aptitude and ability of the child and the ability of the parents to pay. IC 31–1–11.5–12(b)(1); *Carr v. Carr* (1992), Ind., 600 N.E.2d 943, 945.

 Philip claims that neither child possessed the aptitude or ability to attend college because one child withdrew from school mid-semester and the other child flunked out after one semester. The occurrence of these events, however, does not mandate a finding of lack of aptitude and ability. The girls' lack of college success occurred during a particularly stressful time in their lives with their father subject to criminal prosecution for the alleged victimization of one of them. The trial court found that the girls' education was disrupted and any future educational desires should be accommodated. The trial court did not abuse its discretion in so finding.

 Philip also argues that the award of counseling expenses was inappropriate because "[n]either of these children are disabled or incapable of supporting themselves[.]" *Appellant's Brief* at 62. Philip relies on *Free v. Free* (1991), Ind.App., 581 N.E.2d 996, in which we held that pursuant to IC 31–1–11.5–12(d)(2), a child's physical disabilities warranted extending the father's support payments beyond the child's twenty-first birthday.[5] This statutory exception does not apply here because the children were nineteen, not twenty-one, when the issue was considered and the expenses ordered. The decree provided for the payment

---

**5.** IC 31–1–11.5–12(d)(2) (1993 Ed.) provides:

"The duty to support a child under this chapter ceases when the child reaches twenty-one (21) years of age unless:

. . . .

(2) the child is incapacitated in which case the child support continues during the incapacity or until further order of the court[.]"

of counseling expenses that were incurred within four years following resolution of the criminal charges against Philip. Thus, it was possible that payment of counseling expenses could occur after the children's twenty-first birthday. Payment of such expenses, however, would be appropriate after such date only if the children are incapacitated. The lack of any incapacity precludes the trial court from providing for payment of counseling expenses incurred after the children's twenty-first birthday.

## V. ATTORNEY FEES

Philip finally contends that the trial court abused its discretion by ordering him to pay a portion of Jean's attorney fees and litigation expenses.[6] IC 31–1–11.5–16 gives the trial court the discretion to "order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorneys' fees[.]" The trial court's decision to award attorney fees will not be reversed except upon a clear showing of abuse of its discretion. *Cavazzi v. Cavazzi* (1992), Ind.App., 597 N.E.2d 1289, 1294. The trial court may consider a number of factors when deciding whether to award attorney fees, including "the amount of assets awarded to the parties, the relative earning ability of the parties, the superiority and availability of funds available to one party in relation to the other, and which party initiated the action." *Crowe v. Crowe* (1990), Ind.App., 555 N.E.2d 180, 183.

The trial court's decision was based on its finding that Jean had "inadequate funds to discharge such fees" and its conclusion that Philip's payment of the fees was warranted "[d]ue to the respective earnings [sic] capabilities of the parties[.]" *Record* at 335, 339. The evidence does not support the trial court's findings. Prior to the final hearing, the parties agreed upon a partial distribution of the proceeds from the sale of their real estate holdings. Jean received $267,000. Of this amount, $185,000 remained in Jean's bank accounts at the time of the final hearing. Jean also received an additional $70,000

from the remaining real estate proceeds in escrow; over $40,000 in cash to achieve an equal distribution of property; and $21,000 in reimbursement for expenses paid during the pendency of the dissolution.

In contrast, Philip had approximately $8,200 left over from his $70,000 share of the escrow account once he paid all of the expenses ordered by the trial court. He, too, received $250,000 in an early distribution, but the record reflects that most of it was spent on legal fees in connection with the criminal proceedings against him.

The record reflects that Jean received a significantly larger amount of cash, which was readily available to her, than did Philip. The trial court's finding to the contrary, that Jean had inadequate funds to pay her legal fees and expenses, was not supported by the evidence.

The evidence also does not support the trial court's finding that the relative earning ability of the parties warranted an award of attorney fees in Jean's favor. The record reflects that both Jean and Philip were fully capable of obtaining gainful employment. Philip was an experienced home builder with highly technical skills. Jean had a bachelor's degree in business administration and several professional licenses enabling her to build and sell homes. While the trial court found that Philip was voluntarily underemployed, this is not a reason to award attorney fees to Jean. An examination of both parties' earning abilities is necessary; the fact that one is not living up to his potential does not justify awarding attorney fees to the other who is also capable of earning a sufficient income. The award of attorney fees and litigation expenses is reversed.

## VI. FAULT

Finally, Philip argues that the trial court impermissibly relied on fault when dividing the marital property and allocating expenses. He claims that the court sought to punish him for the criminal allegations against him. Similar reasoning was applied in *R.E.G. v. L.M.G.* (1991), Ind.App., 571 N.E.2d 298,

---

6. Philip states that he was ordered to pay $48,-245.77 in fees and expenses. *Appellant's Brief* at

62. The final decree, however, provides that Philip pay $40,000. *Record* at 340, 342.

where we held that the trial court's unequal division of marital property and award of attorney fees was impermissibly based upon the trial court's express finding that the husband's homosexual relationships may have placed the wife at risk for developing Acquired Immune Deficiency Syndrome (AIDS) and that the husband's sexual preference contributed to the failure of the marriage. 571 N.E.2d at 300.

*R.E.G.* does not govern the disposition of the present case. Here, there was an equal division of marital property, albeit with an erroneous valuation of assets. The trial court did not make an express finding of fault and did not inject fault into the fashioning of the final decree. In reviewing the property division and award of fees, we have addressed and resolved all error Philip claims to have occurred. We have remanded the cause for correction of the errors. Once that occurs, the trial court's determination that an equal division of property is just and reasonable will be maintained. Based upon the contribution of the parties to the marriage and the acquisition of assets, it is illogical to conclude that, on the facts contained in this record, the trial court could have based the property division on fault and still ordered an equal division of marital property.

## VII. CONCLUSION

We dispose of this appeal as follows:

1. The property division is reversed. On remand, the trial court is directed to:

 a. Redetermine the value of Quillen Construction.

 b. Determine whether Jean's bank accounts discussed in Section I.C. *supra* are marital assets.

 c. Adjust the property division to reflect the outcome of a. and b. and achieve an equal division.

2. The trial court is to hold a hearing on the capital gains tax issue and determine whether Philip and Jean were jointly and severally liable for the 1993 taxes and using that information, resolve the tax issue in accordance with Section I.D. *supra.*

3. The allocation of expenses paid pending dissolution is affirmed.

4. The non-emancipation status of Chaucie and Brandy is affirmed.

5. The provision requiring payment of education expenses is affirmed. The provision requiring payment of counseling expenses is affirmed except for the provision for payment of counseling expenses after the children attain the age of twenty-one years, which is reversed.

6. The award of attorney fees is reversed.

FRIEDLANDER, J., concurs.

HOFFMAN, J., concurs and dissents with separate opinion.

HOFFMAN, Judge, concurring and dissenting.

I concur in part and dissent in part. A court reviewing the disposition of marital assets will consider only that evidence most favorable to the trial court's determination. *Berger v. Berger* (1995), Ind.App., 648 N.E.2d 378, 381. The trial court's disposition of property is viewed as a whole, not item by item. *Id.* Further, a party challenging the trial court's division of the marital assets must overcome a presumption that the trial court considered all evidence and properly applied the statutory factors. *Livingston v. Livingston* (1992), Ind.App., 583 N.E.2d 1225, 1227–1228.

Further, when valuing the marital assets, the trial court has discretion to set any date between the date of filing the dissolution petition and the date of the hearing. *Eyler v. Eyler* (1986), Ind., 492 N.E.2d 1071, 1074. The majority notes that this Court has upheld valuations which consider changes in circumstances between the filing date and the hearing date. It does not follow that had the changes not been considered, the valuations would have been reversed.

On review, this Court may not substitute its judgment for that of the trial court and can consider only the evidence most favorable to the trial court's disposition. *Castaneda v. Castaneda* (1993), Ind.App., 615 N.E.2d 467, 470. The trial court acted within its discretion, and the evidence adduced supports the valuation. Thus, I reject the qualifying language the majority appended to the

standard. Because the standard currently allows the trial court to choose a date which recognizes changes in the value of assets between the date of final separation and the final hearing, the modification serves only to limit the discretion of the trier of fact. The majority reweighed the evidence in remanding for a new valuation of the construction business.[7]

Additionally, the remand for further findings and any necessary disposition of the accounts is unnecessary when review of the record revealed that no testimony or documentation was entered into evidence concerning the balance of the accounts. Where the parties fail to present evidence as to the value of assets, it will be presumed that the trial court's decision is proper. *Cf. Livingston*, 583 N.E.2d at 1228. This is especially true in that the parties cannot present new or additional evidence through the appellate process. As noted above, the disposition is considered as a whole, not item by item. *Id.* I would vote to affirm the valuation of the marital assets.

Further, I disagree that the trial court did not find that the children were incapacitated. Relying upon expert evidence, the trial court specifically found:

> "29. . . . Both daughters have on-going counseling needs related to victim abuse (Stipulated letter from Dr. Campbell) and post traumatic stress syndrome (Testimony of Hanna Cohen)."

Accordingly, I would vote to affirm the trial court's determination as to counseling expenses.

Finally, I disagree that the trial court erred in awarding Jean's attorney fees and litigation expenses. IND.CODE § 31-1-11.5-16 (1992 Supp.) provides, in pertinent part:

> "(a) The court from time to time may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorneys' fees, including sums for legal services rendered and costs incurred prior to the commencement of the

proceedings or after entry of judgment. The court may order the amount to be paid directly to the attorney, who may enforce the order in his name."

A trial court enjoys broad discretion in assessing attorney's fees in dissolution cases. *In re Marriage of Lewis* (1994), Ind.App., 638 N.E.2d 859, 861. In considering whether to make such an award and the appropriate amount, the trial court may consider factors including: the resources of the parties, the relative earning ability of the parties, the superiority and availability of funds, the result achieved, the size of the estate, and the difficulty of the issues. *See Riddle v. Riddle* (1991), Ind.App., 566 N.E.2d 78, 83; *Canaday v. Canaday* (1984), Ind.App., 467 N.E.2d 783, 785.

Here, the trial court did not abuse its discretion in awarding attorney's fees and litigation expenses. Evidence was presented as to the amount of attorney's fees and the relative resources of the parties. As in most dissolution proceedings, the parties each were required to expend funds for personal maintenance. That Philip spent a substantial amount on his defense in pending criminal matters does not alter the evidence that Jean bore the main financial burden in sustaining the welfare of the children and maintaining the tangible property after the sale of their residences. That the marital estate was sizeable and that the complexity of the issues required substantial litigation expenses is clear. The award of attorney's fees should be affirmed.

Therefore, I disagree as set out herein, and I concur as to the remaining issues.

---

7. The majority reweighed the evidence to find the trial court improperly determined that Naples 38, Inc. is a successor in interest to Quillen Construction; however, the determination does not appear to alter the valuation of the marital estate.