ATTORNEY FOR APPELLANT
Mark Small
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
Richard A. Clem
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
STATE OF INDIANA
Steve Carter
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Frances Barrow
Julie A. Hoffman
Deputy Attorneys General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 32S01-0604-CV-136

IN RE THE MARRIAGE OF,

JEFFREY LAMBERT,

*Appellant (Petitioner below),*

v.

JILL LAMBERT,

*Appellee (Respondent below).*

Appeal from the Hendricks Superior Court, No. 32D01-0207-DR-104
The Honorable Robert W. Freese, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 32A01-0412-CV-535

**February 22, 2007**

**Shepard, Chief Justice.**

When appellant Jeffrey Lambert and his former wife were about to be divorced, it was already apparent that Lambert was soon headed for prison. The trial court issued a child support order based on Lambert's wages from his existing private employment. It was appropriate to base support after release on that rate of income, and thus place the burden on Lambert to establish after his release, through petition to modify, that his income might be lower than it had been before his conviction. While our Child Support Guidelines obligate every parent to provide some support even when they have no apparent present income, it was error to set support based on employment income that plainly would not be there during incarceration.

**Facts and Procedural History**

Jeffrey Lambert and Jill Lambert married in October 1995. Seven years later, two of Jill Lambert's nieces accused Jeffrey of molesting them. The couple subsequently separated and filed for divorce.

As part of a provisional agreement, Jeffrey agreed to pay $277 per week to support the couple's two children. Apparently, this figure was based on Jeffrey's bi-weekly income at the time, about $3,100, derived from rental properties and his work as a computer consultant. After the provisional order took effect, but before the final hearing on the dissolution, Jeffrey was convicted of two counts of "improper and inappropriate physical contact with [Jill's] minor nieces" and sentenced to a period of incarceration. (Appellant's App. at 17; Tr. at 18.) Jeffrey was in jail at the time of the final hearing and, therefore, earning virtually nothing. Still, the Final Decree ordered that he continue to pay the $277 per week in support. The court concluded that because Jeffrey's "incarceration [was] due entirely to his own voluntary actions" it was proper "to impute income to [him] consistent with the original child support calculation." (Appellant's App. at 18.)

Jeffrey appealed, arguing that the court erred in imputing to him pre-incarceration income in calculating the child support payment. A divided panel of the Court of Appeals rejected this argument and affirmed. Lambert v. Lambert, 839 N.E.2d 708, 717 (Ind. Ct. App. 2005), vacated.

The majority concluded that criminal activity constituted voluntary unemployment or underemployment under Ind. Child Support Guideline 3(A)(3), and justified the calculation of the child support payment based on Jeffrey's potential, or pre-incarceration, income. Id. at 712-15.

We granted transfer, vacating the decision of the Court of Appeals.[1] Guided by the lodestar of support issues – the best interests of the child – and following examination of the various approaches to this issue, we hold that incarceration does not relieve parents of their child support obligations. On the other hand, in determining support orders, courts should not impute potential income to an imprisoned parent based on pre-incarceration wages or other employment-related income, but should rather calculate support based on the actual income and assets available to the parent.

## I. Alternative Approaches Reflected in Other States

By some estimates, nearly a quarter of all state prisoners are parents who have open child support cases. Re-Entry Policy Council, Report of the Re-Entry Policy Council: Charting the Safe and Successful Return of Prisoners to the Community 190, 198 (2004).[2] It is thus not surprising that several states have dealt with how to treat incarceration for the purposes of determining income when setting or modifying child support obligations. Most of these reported cases deal with whether incarceration should justify the reduction of an existing support order, and we must be careful to distinguish that issue from the case at hand. See Frank J. Wozniak, Annotation, Loss of Income Due to Incarceration As Affecting Child Support Obligation, 27 A.L.R. 5th 540 (1995).

---

[1] Jeffrey also raises a claim that the trial court erred in dividing the marital estate equally between the parties. (Appellant's Br. at 14-17.) We summarily affirm the decision of the Court of Appeals as to that portion of the appeal. Ind. Appellate Rule 58(A).

[2] See also Jessica Pearson, Building Debt While Doing Time: Child Support and Incarceration, Judges' J., Winter 2004, at 5, 5.

Among the relatively small number of cases that deal directly with this issue, a number of separate approaches have been articulated. We examine these approaches here briefly to provide the basis for further discussion.

A. *Absolute Justification Rule.* Some seven states consider imprisonment absolutely sufficient grounds to justify modifying or suspending child support. Yerkes v. Yerkes, 573 Pa. 294, 300 n.4, 824 A.2d 1169, 1172 n.4 (2003). A typical example of this approach is the case of Leasure v. Leasure, 378 Pa. Super. 613, 549 A.2d 225 (1998). There, the Pennsylvania Superior Court ordered a non-custodial parent's support obligation suspended during incarceration because imprisonment represented a change in circumstances sufficient to justify modification. Id. at 618, 549 A.2d at 228. The court rejected the argument that imprisonment constituted voluntary unemployment or underemployment, and instead noted that continuing the support order would excessively burden the parent least likely to be able to pay the debt. Id. at 616-17, 549 A.2d at 227.

While the Pennsylvania Supreme Court later disapproved Leasure, we mention it here because it typifies other state authority and is roughly analogous to the issue presented here in the sense that the outcome is the same no matter when the support order is set. That is, if incarceration is a sufficient non-voluntary change in circumstances to justify a modification or suspension of the obligation, it could also support an approach where no obligation is imposed on an individual who is imprisoned at the moment the order is set.

B. *Imputation of Pre-Incarceration Income Allowed.* A number of states have concluded that it is appropriate to impute pre-incarceration income to the non-custodial parent. See Wozniak, supra, at 587-91.

In most of these cases, the question turns on whether incarceration constitutes a voluntary reduction of income. In In re Marriage of Olsen, 257 Mont. 208, 848 P.2d 1026 (1993), for example, the Montana Supreme Court considered whether a trial court had improperly imputed pre-incarceration income to an individual who was imprisoned at the time the final order was entered. Affirming the decision to impute that income, the court specifically rejected the

parent's contention that "while his criminal conduct was voluntary, the resulting unemployment . . . was involuntary and unforeseeable under the circumstances." Id. at 215, 848 P.2d at 1031. Instead, the court followed the reasoning of its prior cases that "a criminal should not be offered a reprieve from [his] child support obligations when we do not do the same for one who becomes voluntarily unemployed." Id. (citing Mooney v. Brennan, 257 Mont. 197, 200-01, 848 P.2d 1020, 1022-23 (1993)).

Similar decisions linking criminal conduct with the voluntary reduction of income are found elsewhere. See, e.g., In re R.H., 686 N.W.2d 107 (N.D. 2004); Proctor v. Proctor, 773 P.2d 1389 (Utah Ct. App. 1989).

*C. Disallowing Imputation of Pre-Incarceration Income.* In at least one case, a state supreme court has cited the state's child support guidelines as a basis for holding that a trial court cannot impute pre-incarceration income to an individual imprisoned at the time the order is set.

In State v. Porter, 259 Neb. 366, 372-74, 610 N.W.2d 23, 28-29 (2000), the Nebraska Supreme Court concluded that imposing pre-incarceration income on a felon would conflict with the state's child support guidelines precisely because an imprisoned individual had no "earning capacity." It likened the situation to other cases in which it had "approved the use of earning capacity instead of actual earnings in an initial determination under [the guidelines]" and concluding that in those cases, "there has been evidence that the parent had the present ability to achieve his or her earning capacity." Id. at 372-73, 610 N.W.2d at 28. Unlike those cases, the court concluded, a prisoner has no present ability to achieve the income. Id. at 374, 610 N.W.2d at 29.

The court specifically rejected the notion that his voluntary choice to commit a crime led to the reduction in his income by stating that so long as "earning capacity is used as a basis for an initial determination of child support . . . there must be some evidence that the parent is capable of realizing such capacity." Id. It imposed the minimum child support obligation as outlined in the state's guidelines and noted that income does not consist solely of wages, thus leaving open the possibility for a higher support obligation. Id.

5

## II.  What Is Most Likely to Produce Support?

We conclude that the approach taken in Nebraska is the most consistent with the Guidelines and applicable statute, with one caveat.  It seems appropriate to impute pre-incarceration income to the obligor after release and place the burden on the obligor to seek modification if such is warranted.  We lay out below the basis for this holding.

*A.  Suspending Support Inconsistent with Statute.*  Adopting a system that considers incarceration an absolute justification for the reduction or suspension of child support appears inconsistent with the policy embedded in Indiana's statutes.

The Indiana Code provides that "[t]he duty to support a child under [law] ceases when the child becomes twenty-one (21) years of age" unless the child is emancipated, or the court determines that the child is at least eighteen, not attending school, and supporting herself through employment.[3]  Ind. Code Ann. § 31-16-6-6 (West 2006).  Given the robust approach our legislature has taken to ensure that all children are supported adequately by their parents until the age of majority, we cannot imagine that the legislature intended for incarcerated parents to be granted a full reprieve from their child support obligations while their children are minors.  Consequently, we think it would be inappropriate to adopt a practice of "absolute justification."

Moreover, adopting such a position would cut against the established common law tradition that has long held parents responsible for the support of their offspring.  In this state, that tradition extends back a very long time.  See, e.g., Haase v. Roehrscheid, 6 Ind. 66, 68 (1854) ("[i]t is the duty of a father to support and educate his minor children").  It makes little sense to choose a path that cuts against the grain of statute, legal tradition, and natural instinct so completely.

---

[3] The statute also provides that child support will last beyond the twenty-first birthday when a child is incapacitated "[i]n [which] case, the child support continues during the incapacity or until further order of the court."  Ind. Code Ann. § 31-16-6-6(a)(2) (West 2006).

*B. No Justification Rule Inconsistent with Guidelines.* Indiana child support policy has long looked to an obligor's capacity to earn. Obligors who could work and do not, or appear regularly underemployed, face demands to do better by their dependent children.

The Guideline provisions on "voluntary unemployment or underemployment" reflect this approach. The commentary to Ind. Child Support Guideline 3(A)(3) states: "Potential income may be determined if a parent has no income, or only means-tested income, and is . . . capable of earning more." Child.Supp. G. 3(A)(3) (emphasis added). As the example most relevant to the current situation, the commentary uses the case of a parent who "is capable of entering the work force, but voluntarily fails or refuses to work or to be employed." Child.Supp. G. 3 cmt. 2(c)(2) (emphasis added). This provision indicates that the concept of "voluntary unemployment or underemployment" as used in the Guidelines requires both the ability to earn more income, and the conscious choice on the part of a parent to reduce income.

Our statutes complement this interpretation. Indiana Code § 31-16-6-1(a)(4) instructs courts to consider "the financial resources and needs of the noncustodial parent" when setting support orders. This strongly implies that it is actual present ability of the non-custodial parent to pay the support ordered that a court is to consider.

The Court of Appeals was correct to note that most criminal activity reflects a voluntary choice, and carries with it the potential for incarceration and consequent unemployment. Lambert, 839 N.E.2d at 714. Still, the choice to commit a crime is not quite the same as "voluntarily fail[ing] or refus[ing] to work or to be employed." Child.Supp. G. 3 cmt. 2(c)(2). Chief Justice Abrahamson clarified the relationship between the choices best when she observed that "[a] parent's moral culpability in the events that [led to incarceration] is relevant . . . to the extent that it demonstrates an intent to reduce available income or assets to avoid paying child support." In re Marriage of Rottscheit, 262 Wis. 2d 292, 326, 664 N.W.2d 525, 541 (2003) (Abrahamson, C.J., dissenting). The choice to commit a crime is so far removed from the decision to avoid child support obligations that it is inappropriate to consider them as identical.

7

We believe the conclusion is also supported by the overarching policy goal of all family court matters involving children: protecting the best interests of those children. The child support system is not meant to serve a punitive purpose. Rather, the system is an economic one, designed to measure the relative contribution each parent should make – and is capable of making – to share fairly the economic burdens of child rearing. Child.Supp. G. 1. Considering the existing sociological evidence, it seems apparent that imposing impossibly high support payments on incarcerated parents acts like a punitive measure, and does an injustice to the best interests of the child by ignoring factors that can, and frequently do, severely damage the parent-child relationship.

Individual reactions to economic realities can have profound effects on the behavior of non-custodial parents. Substantial sociological research has focused on the effects child support obligations and incarceration have on the behavior of non-custodial parents.[4] These studies have generally concluded that the existence of unsustainable support orders actually leads to greater failure of non-custodial parents to pay their support obligations.[5]

The Council of State Governments has created the Re-Entry Policy Council to promote study and innovation in this field, and federal departments such as Justice and Labor have supported its work. The Council has produced a comprehensive report on the difficulties of re-admitting prisoners into society. The report identified child support obligations, especially arrearages, as a barrier to successful re-entry into society because they have a tendency to disrupt family reunification, parent-child contact, and the employment patterns of ex-prisoners. Re-Entry Policy Council, supra, at 327.

---

[4] See, e.g., Judi Bartfeld & Daniel R. Meyer, Child Support Compliance Among Discretionary and Nondiscretionary Obligors, 77 Soc. Serv. Rev. 347 (2003); Harry J. Holzer & Paul Offner, The Puzzle of Black Male Unemployment, Pub. Int., Winter 2004, at 74; Harry J. Holzer et al., Declining Employment Among Young Black Less-Educated Men: The Role of Incarceration and Child Support (2004); I-Fen Lin, Perceived Fairness and Compliance with Child Support Obligations, 62 J. Marriage & Fam. 388 (2000).

[5] For a more detailed description, see the sources cited above. For support for the opposite conclusion, that enforcement policies have limited impact on non-custodial parent compliance or participation in the legitimate labor market, see Richard B. Freeman & Jane Waldfogel, Does Child Support Enforcement Policy Affect Male Labor Supply?, in Fathers Under Fire: The Revolution in Child Support Enforcement 94 (Irwin Garfinkel et al. eds., 1998).

Among the factors identified as contributing to lack of compliance with support orders is the perception among obligors, whether incarcerated or not, that the imposition of high support orders is punitive or otherwise unfair. Lin, supra note 4, at 395-96. Analysis reveals that when the support order has produced large arrearages, there is a significant decline in compliance with the order. Bartfeld & Meyer, supra note 4, at 365. The ultimate implication of this research is that when a parent is finally released from prison with a large child support arrearage, the parent is less likely to comply with the order.

Moreover, once released, non-custodial parents tend to view the methods employed to collect support and arrearages as a disincentive to seek legitimate gainful employment. Research suggests that high maximum garnishment rates[6] and other enforcement mechanisms tend to discourage employment, particularly among the lower socioeconomic strata, which tend to view employment as elastic in nature. Holzer & Offner, supra note 4, at 79-80; Holzer et al., supra note 4, at 24. When combined with the difficulty faced by felons in obtaining employment, there is thus a strong incentive to seek work in the "underground economy" where it is difficult for authorities and custodial parents to track earnings and collect payments. Re-Entry Policy Council, supra, at 327.

The ultimate lesson to be drawn from this research is that when high support orders continue through a period of incarceration and thus build arrearages, the response by the obligor is to find more methods of avoiding payment. To the extent that an order fails to take into account the real financial capacity of a jailed parent, the system fails the child by making it statistically more likely that the child will be deprived of adequate support over the long term.

*C. Not Imputing Income Is the Best Solution.* Ultimately, adoption of the non-imputation approach preserves the traditional rule imposing support without ignoring the realities of incarceration. Unlike the absolute justification rule, the non-imputation approach allows courts to comply with the Guidelines by imposing at least the minimal support order as provided by Ind. Child Support Guideline 2. This serves the child support system by ensuring that all non-custodial parents remain responsible – at least to some degree – for the support of their children.

---

[6] See, e.g., Ind. Code Ann. § 24-4.5-5-105(3) (West 2006) (up to 65% of disposable earnings).

The most obvious examples of the unfair results that would occur under an absolutist approach are the case of the very wealthy and the very poor non-custodial parent. Under an absolute justification system, the very wealthy but incarcerated parent is absolved of support obligations when, in fact, there is the likelihood that sources of income exclusive of wages could reasonably be expected to pay the cost of support. On the other hand, the imputed income rule unfairly burdens the very poor incarcerated parent under circumstances in which he lacks the capacity to pay his support obligations.

None of the foregoing precludes setting support orders that reflect the actual income or resources of an incarcerated parent. It merely counsels against imputing pre-incarceration wages, salaries, commissions, or other employment income to the individual. A court may, obviously, still consider other sources of income when calculating support payments. See Child.Supp. G. 3(A). Consequently, unlike the absolute justification rule, prisoners who do have the capacity to pay higher support obligations remain responsible for that support level.

Moreover, a court could well order an increased support payment as soon as the incapacity caused by prison is removed from a non-custodial parent's ability to earn income. In other words, a court could prospectively order that child support return to the pre-incarceration level upon a prisoner's release because following release, the parent is theoretically able to return to that wage level. Such an order has multiple benefits. First, it encourages non-custodial parents to track carefully their support obligation, as it would require an incarcerated parent to seek modification of the order upon their release. Second, it relieves the custodial parent from the added burden of tracking the expected release date of the obligor and filing for modification upon that release.

**Conclusion**

Here, the court was justified in predicting that the obligor might re-attain something like his pre-incarceration income – and placing on the obligor the burden to petition for a

modification.  Ordering that same support during incarceration was error, however, unless there were other means (like the obligor's income derived from rental properties and his portion of the property division) to meet it.  The record here suggests that such means might exist in this case.

We affirm the trial court's support order as respects the period after Lambert's incarceration and remand for entry of such current amount as reflects Lambert's actual present resources.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.