656 S.E.2d 47

**Angela ADKINS, Petitioner Below, Appellee,**

v.

**Christopher ADKINS, Respondent Below, Appellant.**

**No. 33312.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2007.

Decided Nov. 8, 2007.

---

1. The firm is Dombroff Gilmore Jaques & French, P.C.

Hoyt E. Glazer, Legal Aid of West Virginia, Inc., Huntington, West Virginia, Mark A. Toor, Legal Aid of West Virginia, Inc., Charleston, West Virginia, for the Appellee, Angela Adkins.

Jennifer Dickens Ransbottom, Ransbottom Law Office, Huntington, West Virginia, for the appellant, Christopher Adkins.

Kimberly D. Bentley, Assistant General Counsel, West Virginia Department of Health & Human Resources, Charleston, West Virginia, Counsel for the Appellee, Bureau for Child Support Enforcement.

ALBRIGHT, Justice.

This matter is before the Court on direct appeal of an order entered on September 27, 2006, by the Family Court of Cabell County[1] in which the petition of Christopher Adkins (hereinafter referred to as "Appellant") to modify a child support obligation was denied. Appellant petitioned for modification of child support payments[2] on the basis that he was unable to work because he had been incarcerated since his divorce from Angela Adkins[3] (hereinafter referred to as "Appellee") was finalized. He had maintained below that incarceration was the type of change in circumstance which warranted a reduction in child support. We are also told that Appellant alternatively proposed that the amount of child support be recalculated on the basis of attributed minimum wage as opposed to his pre-incarceration wages.[4] After careful study of these matters and for the reasons set forth in our discussion below, we find that incarceration does not relieve a parent of the obligation to pay child support, but the amount of child support a parent may be obligated to pay while incarcerated should be calculated on the actual income and assets then available to that parent. Accordingly, the decision of the family court is affirmed, in part, and reversed, in part, and this case is remanded for further action consistent with this opinion.

## I. Factual and Procedural Background

The parties were divorced by order entered on September 2, 2004, and child support was fixed in that order at $392.67 per month based on the job Appellant then had as a truck driver. See supra n. 4. As related in the divorce order, the parties separated on or about June 9, 2004. Around the time of the separation, Appellee's family took steps to have the charge of sexual assault in the third degree brought against Appellant.[5] Appellant maintains that he was not actually charged with the crime until after the final divorce hearing was held, and the record reflects that the sole consideration of the court at the time the initial child support calculation was made was Appellant's earnings as a truck driver.[6] As related in the September 27, 2006, order, Appellant pled guilty to the sexual assault charge on February 17, 2006, was sentenced on April 12, 2006, and is currently serving a sentence of two to ten years in prison for that crime.

Appellant first filed a petition with the family court seeking modification of his child support obligation on March 8, 2006, when he lost his job after pleading guilty to the sexual assault charges. The request for modification was summarily denied by order entered March 17, 2006. On June 5, 2006, after being sentenced and at the onset of serving his prison term, Appellant filed a second

---

1. See W.Va.Code § 51–2A–15(a) (2001) (2007 Supp.) (allowing direct appeal to this Court of family court orders under certain circumstances).

2. See W.Va.Code §§ 48–11–105 to 48–11–107 (2001) (Repl.Vol.2004) (statutory provisions governing modification of child support orders).

3. We are advised in the briefs that Angela Adkins has assumed the surname of Clay.

4. The initial child support obligation was based on Appellant's earning $9.12 per hour as a truck driver; minimum wage is $5.15 per hour.

5. It appears that the assault charged occurred nearly a year prior to the marital separation and involved a minor, other than the parties' two children, who had been living in the parties' home.

6. The record reflects that the family court was not made aware of these criminal acts until February 23, 2006, when Appellee petitioned the court for modification of visitation based on the sexual assault conviction.

petition to modify his child support obligation. Appellant indicated in the second petition that his incarceration was a material change in circumstances and that he could no longer pay child support. This petition contained a request to eliminate the obligation or to reduce it to the statutory minimum of fifty dollars a month [7] "so that his mother could help him pay the same" until he was released and able to return to work. On September 27, 2006, modification again was denied by order of the family court. It was indicated in this order that no change would be made in the child support obligation because Appellant was in jail as a result of his own behavior and commission of a crime is the same as voluntarily quitting a job, making it an unacceptable reason to modify the obligation. The order did grant Appellant's request to enjoin the Bureau for Child Support Enforcement [8] (hereinafter referred to as "BCSE") from initiating proceedings to revoke his driver's license so he would be in a better position to seek employment after his release.

The parties jointly waived their right to petition for appeal to the circuit court and elected instead to directly seek review from this Court. Such review was granted by order entered on February 15, 2007.

## II. Standard of Review

◼ Our analysis of the issues raised in this case is guided by the standard for review of final orders from family courts, as articulated in syllabus point one of *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003):

> In reviewing a final order of a family court judge that is appealed directly to this Court, we review findings of fact by a family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

7. W.Va.Code § 48–13–302 (2001) (Repl.Vol. 2004).

8. Although not reflected in the style of this case which is taken from the final order of the court below, the State is represented in this appeal by BCSE. The record reflects that the parties' children receive services of the Department of

## III. Discussion

The family court provided the following explanation for denying Appellant's request to modify his child support obligation in its September 27, 2006, order:

> [C]hild support shall remain as currently set because Respondent is in jail due to his own behavior. It is his fault that he cannot work. When he committed the crime, it was the same as voluntarily quitting his job and therefore he cannot reduce his child support.

Appellant argues that the family court's decision to attribute as income his pre-incarceration earnings is incorrect because it is impossible for him while incarcerated to earn the same amount of money he did when the child support obligation was calculated. He additionally maintains that the family court's conclusion that committing a crime is on equal footing with voluntarily quitting a job is unreasonable for child support purposes.

While the question of whether a reduction in wages due to incarceration should be considered a basis for modifying child support obligations is a matter of first impression for this Court, other jurisdictions have wrestled with the issue and have arrived at varying conclusions. *See* Frank J. Wozniak, *Loss of income due to incarceration as affecting child support obligation*, 27 A.L.R.5th 540 (1995). The determinations reached in these cases may be divided roughly into three different approaches to the problem. As summarized by the Pennsylvania Supreme Court in *Yerkes v. Yerkes*, 573 Pa. 294, 824 A.2d 1169 (2003),

> The first approach, dubbed the "no justification" rule, generally deems criminal incarceration as insufficient to justify elimination or reduction of an open obligation to pay child support. The second approach, known as the "complete justification" rule, generally deems incarceration for criminal

Health and Human Resources and both parties have applied for income withholding services from BCSE. *See* W.Va.Code §§ 48–14–102(4) (2001) (Repl.Vol.2004) (parties to action for child support order); 48–14–107 (2005) (Supp.2007) (assistance may be sought from BCSE for modification of child support orders).

conduct as sufficient to justify elimination or reduction of an existing child support obligation. Finally, the third approach is the "one factor" rule, which generally requires the trial court to simply consider the fact of criminal incarceration along with other factors in determining whether to eliminate or reduce an open obligation to pay child support.

*Id.* at 1172 (internal citations omitted).

More recently, the Supreme Court of Indiana in *Lambert v. Lambert*, 861 N.E.2d 1176 (Ind.2007), examined a less substantial number of cases that deal with the narrower question which is more in the context of the case now pending: Whether for child support purposes pre-incarceration income should be attributed to a parent serving a jail sentence. The high court of Indiana found that the conclusions of these courts also fell into three different classifications. In one line of cases, imprisonment was found to serve as an absolute or complete justification for modifying or suspending child support. In a second grouping, the conclusion reached was that pre-incarceration income may be attributed, or imputed as the practice is termed under Indiana law, to the imprisoned parent because the criminal act was voluntary and thus caused a voluntary reduction in income. The third approach results in pre-incarceration income not being subject to attribution because a person in prison has no earning capacity. In examining these approaches the court in *Lambert* observed that the attributed income rule unfairly burdens the very poor who lack the capacity to pay the child support obligation either during the confinement or upon release, whereas the complete justification rule unfairly benefits the very wealthy who would have other sources of income to pay child support. The Indiana high court ultimately concluded for practical reasons that the approach most consistent with Indiana's relevant statutory and case law and most likely to produce actual support was not to attribute pre-incarceration income. As stated in the *Lambert* decision:

> [A]doption of the non-imputation approach preserves the traditional rule imposing support without ignoring the realities of incarceration. Unlike the absolute justification rule, the non-imputation approach allows courts to ... [impose] ... the minimal support order as provided by [the child support guidelines]. This serves the child support system by ensuring that all non-custodial parents remain responsible—at least to some degree—for the support of their children.

*Id.* at 1181. We find this reasoning persuasive in light of the compatible goals evidenced in the relevant statutory and case law of West Virginia.

 It is clear from legislative enactment that imprisonment simply may not in and of itself provide complete justification for modifying or suspending child support payments in this state. As BCSE aptly points out and Appellant conceded during oral argument, by enacting West Virginia Code § 25–1–3c (2005) (Supp.2007), the Legislature has made clear that child support obligations continue even when a parent is imprisoned.[9] By its terms, West Virginia Code § 25–1–3c unambiguously conveys the intent of the Legislature for inmates to retain responsibility for outstanding court-ordered obligations, including child support. As we stated in syllabus point two of *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970), "[w]here the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to inter-

9. The pertinent findings of the Legislature are embodied in subsection (a) of West Virginia Code § 25–1–3c, which reads as follows:

(a) The Legislature finds that:

(1) There is an urgent need for vigorous enforcement of child support, restitution and other court ordered obligations;

(2) The duty of inmates to provide for the needs of dependent children, including their necessary food, clothing, shelter, education and health care should not be avoided because of where the inmate resides;

(3) A person owing a duty of child support who chooses to engage in behaviors that result in the person becoming incarcerated should not be able to avoid child support obligations; and

(4) Each sentenced inmate should be encouraged to meet his or her legitimate court-ordered financial obligations.

During oral argument, Appellant conceded that this statute defeats any argument he had that incarceration alone justifies modification of an existing child support obligation.

pretation" by the courts. *See also* Syl. Pt. 2, *Pond Creek Pocahontas Co. v. Alexander,* 137 W.Va. 864, 74 S.E.2d 590 (1953) ("Where the meaning of a statute is clear and its provisions are unambiguous, this Court will not undertake to construe and interpret it, but will apply the statute as its exact terms require."). We note that the statute not only underscores the public policy of this state that parents remain responsible for supporting their children even when incarcerated, but it also places particular duties on the state's correctional system to assist in accomplishing this goal. Notwithstanding the clarity of legislative intent regarding an inmate's continued obligation to honor court-ordered support during periods of incarceration, we find nothing in its terms or in related statutes which conveys legislative intent to completely disallow modification of support orders during incarceration. Absent such a bar, modification of support obligations imposed on incarcerated persons may be sought in the same manner as any parent. *See* W.Va.Code §§ 48–11–105, –106, –106a, and § 48–14–107. Moreover, we find no legislative direction specifically addressing pre-incarceration earnings in the context of attribution of income for child support purposes.

Attribution of income is a legislative invention. *State ex rel. Dept. of Health and Human Resources, Child Support Enforcement Div. v. Baker,* 210 W.Va. 213, 217, 557 S.E.2d 267, 271 (2001). Under West Virginia Code § 48–1–205 (2001) (Repl.Vol.2004), income in the form of wages may be attributed under certain circumstances to a parent who is unemployed, not working full time or working below full-earning capacity. As expressly provided in subsection (b) of West Virginia Code § 48–1–205:

> If an obligor: (1) Voluntarily leaves employment or voluntarily alters his or her pattern of employment so as to be unemployed, underemployed or employed below full-earning capacity; (2) is able to work

and is available for full-time work for which he or she is fitted by prior training or experience; and (3) is not seeking employment in the manner that a reasonably prudent person in his or her circumstances would do, then an alternative method for the court to determine gross income is to attribute to the person an earning capacity based on his or her previous income.

█ In *Baker* we overturned a lower court's judgment finding that an involuntary employment termination was the legal equivalent of a voluntary act solely because the underlying reason for the termination of employment was intentional misconduct. We held that the voluntary action contemplated by the provisions of the attribution statute requires some evidence that the child support obligor "effectuated a dismissal from his/her place of employment for the express purpose of avoiding or affecting child support payments." *Baker* at Syl. Pt. 5. We further noted in *Baker* that "an involuntary termination, including those that are for cause and which involve intentional conduct, does not come within the statutory purview of voluntary action required to invoke the specific provisions of West Virginia Code § . . . [48–1–205(b)] concerning attribution of income based on an obligor's prior level of income." *Id.*

█ Aside from a conviction for violating West Virginia Code § 61–5–29 (1999) (Repl. Vol.2005) by failing to pay child support,[10] generally the mere conviction of a criminal offense would not of itself demonstrate a voluntary act as contemplated by the attribution statute. In the case now pending, Appellant was involuntarily terminated when his employer was made aware that Appellant had pled guilty to sexual assault charges. Without distinguishing our holding in *Baker,* the family court found that, for attribution purposes, committing a crime was equivalent

---

10. We observe that attributing income from employment at a level an incarcerated parent is incapable of earning while confined would place the parent in jeopardy of violating this criminal statute. Additionally, fixing unattainable child support payments would result in accrual of substantial child support arrearages which has direct bearing on the amount of funding the state

receives to collect delinquent child support. *See* 45 C.F.R. § 305.2 As a result, such unrealistic child support obligations has the negative effects of not serving the best interests of the children of incarcerated parents either individually or collectively, and jeopardizing federal support for services available to all children in the state.

to voluntarily quitting a job. Although the obligor in *Baker* was involuntarily terminated for reasons not involving criminal charges, the logic underlying our decision in *Baker* is equally vital under the facts of the present case. Proof of voluntariness remains the same whether or not the action which triggered dismissal from employment rose to the level of a crime or generated the filing of criminal charges. Thus for the family court to attribute pre-incarceration income to Appellant, there had to be some evidence that demonstrated the sexual assault offenses were committed "for the express purpose of avoiding or affecting child support payments." *Baker* at Syl. Pt. 5. Furthermore, Appellant's circumstances while incarcerated do not appear to meet the remainder of the statutory qualifiers for application of the attribution of income statute. While Appellant is incarcerated he would not likely be available for full-time work for which he is trained and/or experienced, and no incarcerated person, "reasonably prudent" or not, would be free to seek such employment while serving a criminal sentence. W.Va.Code § 48–1–205(b). We conclude, therefore, that pre-incarceration income from employment earnings may not be attributed as income for child support purposes while a parent is incarcerated because such income fails to meet the qualifications set forth in West Virginia Code § 48–1–205(b). Being that the lower court erred as a matter of law, we reverse the ruling and remand the case for further action consistent with this opinion.

■■■ Despite our finding that pre-incarceration income from wages may not be attributed as income for child support purposes, nothing stands in the way of family courts entering support orders that reflect actual income and resources of an incarcerated parent. Plainly, parents have an abiding duty to provide support for their dependent children. Courts remain obligated under the relevant statutory guidelines for child support awards to consider all sources of income or other property when calculating support payments initially or upon modification. Nor should our holding be taken to suggest that the provisions of West Virginia Code § 48–13–302 regarding minimum child support payments are rendered meaningless when a

parent is incarcerated. Accordingly, we further hold that the support obligation of an incarcerated person should be set in light of that person's actual earnings while incarcerated and other assets of the incarcerated person practically available to provide such support.

In advancement of the goal to have child support obligations reflect as accurately as possible the present earning capacity of parents, the Indiana Supreme Court endorsed the practice of incorporating a prospective provision in the orders issued in cases involving incarcerated parents in order to automatically return the child support obligation to the pre-incarceration level upon the release of the affected parent. As explained by the Indiana court in *Lambert*, such practice relieves the custodial parent from having to monitor when the incarcerated parent will be released so that modification may be timely sought, and shifts the responsibility for seeking modification to the parent who has the knowledge and information about post-incarceration employment. 861 N.E.2d at 1182. We appreciate the convenience of such approach, but as with most simplistic answers it has its weaknesses. Most notably, a release may occur so far into the future that the pre-incarceration income level would no longer comport with changes in larger economic realities such as minimum wage rates. In such instances, the custodial parent would not be relieved of the task of independently monitoring the income of the obligor parent to ascertain whether it has any correlation to the prospectively awarded child support rate. A more workable solution would be for the courts having jurisdiction of the support matter to be advised by the penal institution of the impending release date of a child support obligor so that a hearing may be set and notices issued.

■■■ We noted earlier that the Legislature has imposed additional duties on the correctional system regarding child support obligations of inmates. Bearing the designation of "Financial Responsibility Program for Inmates," West Virginia Code § 25–1–3c requires the Division of Corrections to assist each inmate in developing a financial plan for

**610**

meeting any child support obligations that exist; directs the warden, within prescribed limits, to deduct from an inmate's earnings certain court-ordered obligations, including child support; and charges the Division of Corrections with the responsibility of developing a recordkeeping system which contains complete information about an inmate's wages and child support payments during the period of incarceration. W.Va.Code § 25–1–3c (b) and (c).[11] In furtherance of the legislative initiative to assist incarcerated parents in meeting their child support obligations, we hold that the penal institution, operating under the authority of the Division of Corrections, where a person who is subject to court-ordered child support is incarcerated should assist the inmate in developing a plan designed to meet his or her child support obligation, and advise the court having jurisdiction of the support matter of the impending release of such persons from incarceration. At the same time, any modification order involving a child support obligation of a person known by the court to be incarcerated may fix a time for reconsideration of the modification upon release of the obligor from incarceration, and include provision for notice to the obligee, the obligor and, if appropriate, the Bureau of Child Support Enforcement, the production of post-incarceration earnings of the obligor and any other information necessary or convenient for such post-incarceration modification of the support obligation.

In sum, we find that incarceration does not relieve a parent of the obligation to pay child support. Nonetheless, the amount of child support a parent who is incarcerated may be ordered to pay must be calculated on the actual income and assets available to the person during confinement. It is contrary to the provisions of West Virginia Code § 48–1–205 to attribute pre-incarceration income to an incarcerated parent during the course of confinement Once an obligor is released from incarceration, a reassessment of financial status should occur in a timely fashion. To

facilitate this reassessment, penal institutions should advise the courts of the impending release of inmates who are child support obligors so that a modification hearing may be docketed and relevant information may be collected.

### IV. Conclusion

As a result of the foregoing, the September 27, 2006, order of the Family Court of Cabell County is affirmed, in part, and reversed, in part, and the case is remanded for further action consistent with this opinion.

Affirmed, in part, reversed, in part, and remanded.

---

11. We do not have in the matter before us someone who is incarcerated in the regional jail system, although the establishment of a comparable program developed with legislative input would have obvious benefits. Having a uniform meth-

od by which the public policy underlying enforcement of child support obligations throughout the state's penal system can only result in serving the best interests of children.