



FILED

Nov 08 2024, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

In Re the Adoption of K.B. & H.F. (Minor Children),

J.B.,

*Appellant-Respondent*

v.

Ji.K. and Je.K.,

*Appellees-Petitioners*

---

November 8, 2024

Court of Appeals Case No.
23A-AD-2996

Appeal from the Allen Superior Court

The Honorable Lori K. Morgan, Judge

Trial Court Cause No.
02D08-2003-AD-000049
02D08-2003-AD-000050

---

**Opinion by Judge Felix**
Judges Vaidik and Kenworthy concur.

**Felix, Judge.**

## Statement of the Case

K.B. and H.F. (collectively, the "Children") were removed from the care of J.B. ("Father") in 2018. Thereafter, the Children were placed in the care of Ji.K. and Je.K. (collectively, the "Foster Parents"). While the Children were in the custody of the Foster Parents, Father exercised supervised visitation as permitted and supported the Children as he was able. In March 2020, the Foster Parents petitioned to adopt the Children. Father objected to the adoption, but the trial court ultimately determined that Father's consent to the adoption was unnecessary due to Father's failure to significantly communicate with and support the Children when able to do so for one year prior to the filing of the adoption petitions. In 2023, the trial court granted the Foster Parents' petitions to adopt the Children. Father challenges the adoption decree and presents multiple issues for our review, which we restate as the following single issue: Whether the trial court clearly erred in determining Father's consent to the adoption was unnecessary.

We reverse.

## Facts and Procedural History

The Children were born in 2013 and 2014 to Father and A.F. ("Mother"). On May 13, 2018, Father was arrested after law enforcement discovered that he had suffered a drug overdose in his vehicle while the Children were in the backseat. The State charged Father with possession of a narcotic drug, neglect

of a dependent, operating a vehicle while under the influence of a controlled substance with a passenger under 18, and operating a vehicle while intoxicated endangering another person.[1] After Father spent four days in jail, the State dismissed these charges, and he was released. On August 31, 2018, DCS removed the Children from Father and Mother's care due to the May 13 incident and placed them with the Foster Parents,[2] where they remained throughout the course of these proceedings.

[4] After the Children were placed with the Foster Parents, Father was permitted to have weekly supervised visits with the Children. These visits lasted one to two hours, and Father brought food and gifts for the Children. The record does not indicate the exact amount of weekly visits Father attended. From August 31, 2018, through the end of 2018, Father made a "majority" of his visits "but there were times where [he] was late and there were times that [he] called off and did not go." Tr. Vol. II at 43. From the beginning of 2019 until June 13, 2019, Father had the "[s]ame pattern" (i.e. he made a "majority" of the visits, "but there were times where [he] called off and did not go") in regard to his supervised visits with the Children. *Id.* Father's last supervised visit with the Children occurred sometime in May 2019.

---

[1] Cause 02D06-1805-MC-001348.

[2] The removal of the Children was the second time DCS was involved with this family. DCS had removed the Children once before in 2016.

[5] On June 13, 2019, Father was arrested for an incident involving alleged domestic battery where Mother was the victim.[3] Father ultimately pled guilty to domestic battery, strangulation, and multiple drug charges, and he was incarcerated from June 13, 2019, to January 11, 2021. On August 22, 2019, the State refiled charges against Father related to the May 13, 2018, overdose in front of the Children,[4] which included possession of cocaine or a narcotic drug, two counts of neglect of a dependent, and operating a vehicle while intoxicated (the "Neglect Cause"). On January 24, 2020, the trial court issued no-contact orders in the Neglect Cause, prohibiting Father from contacting the Children.[5]

[6] On March 13, 2020, approximately nine months after Father was arrested, the Foster Parents filed petitions to adopt the Children. The following month, both Father and Mother objected to the Foster Parents' petitions. Later that year, in November 2020, Mother passed away from a drug overdose. The following

---

[3] Cause 90C01-1906-F5-000017.

[4] Cause 02D05-1908-F5-000257.

[5] We note that the trial court's order on consent references May 2019 no-contact orders in the Neglect Cause. Appellant's App. Vol. II at 27, 28, 31. However, Father was not charged in the Neglect Cause until August 22, 2019. Our review of the record suggests that this May 2019 date was based on Father's testimony at the consent hearing regarding the no-contact orders. Father testified that the no-contact orders were issued in 2019, but this occurred after he had initially claimed that the no-contact orders were issued in 2018. On appeal, Father recognizes that the no-contact orders were issued in the Neglect Cause on January 24, 2020. Appellant's Br. at 8 ("A No Contact Order was entered in [the Neglect Cause] on January 24, 2020, precluding [Father] from any and all communication with the Children . . . ."). The January 24, 2020, date for the no-contact orders is consistent with the statewide protective order database maintained by the Indiana Supreme Court at mycourts.IN.gov/PORP. We take judicial notice of these records. *See J.K. v. T.C.*, 25 N.E.3d 179, 180 n.2 (Ind. Ct. App. 2015) (citing Ind. Evidence Rule 201(b)(5)).

month, the trial court entered an order in the juvenile paternity cause[6] (the "Paternity Cause") for the Children approving an agreed change of custody from Father to the Foster Parents and stipulating to supervised visits for Father.

[7] On January 11, 2021, Father was released from incarceration and accepted into a Drug Court program[7] in the Neglect Cause where he had weekly appearances with the Drug Court. At these proceedings, Father asked the court to modify the terms of the no-contact orders in the Neglect Cause so he could see the Children. After showing some progress in the Drug Court program, on June 28, 2021, the trial court modified the no-contact orders in the Neglect Cause, allowing Father to have supervised visitation with the Children.

[8] In the Paternity Cause, on September 30, 2021, Father filed a motion asking for Foster Parents to be held in contempt for their alleged failure to permit Father's supervised visits—which had been stipulated to in the agreed change of custody order. Although the no-contact orders had been modified, the Foster Parents did not want to conduct supervised visits at the visitation center provided in the no-contact order modifications. In November 2021, Father and Foster Mother began communicating to agree on an acceptable visitation center and date. On

---

[6] In May 2020, two juvenile paternity causes were initiated in causes 02D07-2005-JP-191 and JP-192 regarding both children. In August 2021, the JP-192 caused was consolidated into the JP-191 caused and closed.

[7] Subsequent to the trial court's decision on consent, Father successfully completed the Drug Court program, and his August 2019 charges were ultimately dismissed.

June 9, 2022, Father attended a video visit with the Children—this was the first communication he had with the Children since May 2019.

[9] The trial court held hearings on the issues of consent and best interests on June 17 and September 14, 2022. On December 12, 2022, the trial court issued an order determining that Father's consent was unnecessary because from March 13, 2019, to March 13, 2020— the year preceding the filing of the Foster Parents' petitions for adoption—Father failed to communicate significantly with the Children when able to do so and failed to support the Children when able to do so. On November 16, 2023, the trial court granted the Foster Parents' petitions to adopt the Children. Father now appeals.

## Discussion and Decision

### Standard of Review

[10] Father challenges the trial court's order granting the Foster Parents' petitions to adopt the Children. Our Supreme Court has described our deferential review in adoption decisions:

> We generally show "considerable deference" to the trial court's decision in family law matters "because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children." *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018) (cleaned up). So, "when reviewing an adoption case, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption." *Id.* And we will not disturb that decision "unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *In re Adoption of*

> *T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). "We will not reweigh evidence or assess the credibility of witnesses." *E.B.F.*, 93 N.E.3d at 762 (citation omitted). "Rather, we examine the evidence in the light most favorable to the trial court's decision." *Id.* (citation omitted).

*In re Adoption of I.B.*, 163 N.E.3d 270, 274 (Ind. 2021). In determining Father's consent was unnecessary for the adoption, the trial court issued findings and conclusions. Thus, we apply a clearly erroneous standard where "we must first determine whether the evidence supports the findings and second, whether the findings support the judgment." *In re Adoption of T.I.*, 4 N.E.3d at 662 (quoting *In re Adoption of T.W.*, 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006)). Father claims that the trial court clearly erred in determining that his consent to the adoption was unnecessary.

[11] Natural parents have special protections in adoption proceedings, and we "strictly construe our adoption statutes to preserve the fundamentally important parent-child relationship." *In re Adoption of I.B.*, 163 N.E.3d at 274 (citing *In re Adoption of N.W.*, 933 N.E.2d 909, 913 (Ind. Ct. App. 2010)). However, there are limitations on the special protections provided to parents in our adoption statute. *See In re Adoption of I.B.*, 163 N.E.3d at 274.; Ind. Code § 31-19-9-8. For instance, "'under carefully enumerated circumstances,' the adoption statutes allow 'the trial court to dispense with parental consent and allow adoption of the child.'" *In re Adoption of I.B.*, 163 N.E.3d at 274 (quoting *In re Adoption of N.W.*, 933 N.E.2d at 913).

[12] The consent-to-adoption statute provides in relevant part as follows:

> (a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
>
> * * *
>
> > (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
> >
> > > (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> > >
> > > (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

I.C. § 31-19-9-8. Our Supreme Court recently recognized a "familiar theme" in our case law on this statute:

> A parent who meets society's expectations by maintaining a connection with her child and by financially supporting her child cannot have her legal relationship with the child severed without her consent. Conversely, when a parent fails to maintain a meaningful relationship with, or fails to financially support, that child, she loses her right as a natural parent to withhold consent to adoption.

*In re Adoption of I.B.*, 163 N.E.3d at 276. The party petitioning for adoption bears the burden of proving by clear and convincing evidence that consent is unnecessary. *Id.* at 274–75 (citing I.C. §§ 31-19-10-1.2(a), 31-19-10-0.5).

[13] Father claims the trial court erred when it determined that he, for a period of one year, (1) failed without justifiable cause to communicate significantly with

the Children when able to do so and (2) failed to provide care and support for the Children when able to do so as required by law.[8]

### 1. The Trial Court Clearly Erred in Determining That Father Failed To Communicate Significantly with the Children for One Year

[14] Father claims that the trial court erred in determining that he failed to communicate significantly with the Children when able to do so from March 13, 2019, to March 13, 2020. Significant communication in this context is not easily defined:

> "A determination on the significance of the communication is not one that can be mathematically calculated to precision." *E.B.F.*, 93 N.E.3d at 763. Indeed, "[e]ven multiple and relatively consistent contacts may not be found significant in context." *Id.* On the other hand, "a single significant communication within one year is sufficient to preserve a non-custodial parent's right to consent to the adoption." *Id.*

*In re Adoption of I.B.*, 163 N.E.3d at 276. The purpose of significant communication here is to "foster and maintain communication between non-custodial parents and their children, not to provide a means for parents to

---

[8] Father also makes an argument claiming that the Foster Parents "acted in bad faith when they used the court system and their role as foster parents to engineer circumstances that would lead to termination of [Father's] parental rights." Appellant's Br. at 27 (emphases removed). Father fails to provide supporting law or cogent reasoning to support his "bad faith" claim, and he fails to provide a single record citation in this argument. *See* Ind. App. R. 46(A)(8)(a). We will not address arguments that are "too poorly developed or improperly expressed to be understood." *Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023) (quoting *Dridi v. Cole Kline LLC*, 172 N.E.3d 361, 364 (Ind. Ct. App. 2021)). Because Father's noncompliance with Appellate Rule 46 substantially impedes our review of Father's bad faith argument, he has waived that claim and we will not address it. *See id.*

maintain just enough contact to thwart potential adoptive parents' efforts to provide a settled environment to the child." *In re Adoption of S.W.*, 979 N.E.2d at 640 (quoting *In re Adoption of J.P.*, 713 N.E.2d 873, 876 (Ind. Ct. App. 1999)). Additionally, "a parent's conduct after the petition to adopt was filed is 'wholly irrelevant to the determination of whether the parent failed to significantly communicate with the child for any one year period.'" *Id.* at 640 n.3 (Ind. Ct. App. 2012) (quoting *In re Adoption of Subzda*, 562 N.E.2d 745, 750 n.3 (Ind. Ct. App. 1990)).

[15]   Father concedes that he did not communicate with the Children from sometime in May 2019 to when the Foster Parents filed their petitions to adopt the Children on March 13, 2020[9]. But Father points us to the supervised visits he attended with the Children from March 13, 2019, to sometime in May 2019. In this timeframe, Father attended a "majority" of these supervised visits that lasted "1 to 2 hours." Tr. Vol. II at 43. The trial court issued the following finding related to these meetings:

> 36. After a lengthy period of abandonment by Father due to his own conduct (using fentanyl in a vehicle with his children), this Court cannot conclude that weekly one-hour visitations that Father admits he missed some for being late or calling off from

---

[9]We note that, during this timeframe, Father was incarcerated from June 13, 2019, until March 13, 2020, and the trial court issued no contact orders on January 24, 2020. These circumstances limited Father's ability to communicate with or contact the Children.

> March 2019 through May 2019 . . . are significant such [sic] not to dispense with his consent.

Appellant's App. Vol. II at 31. Father argues that the only evidence concerning these weekly visits from March 13, 2019, to March 13, 2020, is Father's testimony that he attended most of the visits in this timeframe. We agree with Father and conclude that the Foster Parents failed to show these meetings were not significant.

[16] Our decision in *In re Adoption of J.P.* provides guidance here. There, the trial court dispensed with the mother's consent for adoption due to her failure to communicate significantly with J.P. *In re Adoption of J.P.*, 713 N.E.2d at 874–75. On appeal, the mother pointed to "not-quite-monthly" trips she made from Tennessee to Indiana to visit J.P. for "two to five hours." *Id.* at 876. We noted that "[t]he significance of the communication is not measured in terms of units of visits," *id.*, and we looked to further evidence to determine that the meetings were not significant to J.P. or the mother, *see id.* Specifically, the evidence showed that the mother characterized these trips as "a hardship" and J.P's reactions to the visits "were not particularly favorable." *Id.* Thus, we determined that "evidence was presented that the fairly consistent, but brief, monthly visits [the mother] made to J.P. were not meaningful," *id.*, and affirmed the trial court's decision.

[17] Here, the Foster Parents only provided evidence of the frequency and duration of Father's supervised visits. In other words, they only presented evidence on the "units of visits." *See In re Adoption of J.P.*, 713 N.E.2d at 876. The Foster

Parents failed to provide evidence about the nature or quality of these visits. Thus, we conclude that the evidence does not support the trial court's finding that these visits were not significant. The Foster Parents failed to prove by clear and convincing evidence that Father failed to communicate significantly with the Children for a period of one year.

### 2. The Trial Court Clearly Erred in Determining that Father Failed to Support the Children for a Period of One Year When Able to Do So

[18] Father also argues that the trial court erred when it concluded that he failed to support the Children from March 13, 2019, to March 13, 2020. Although there was not a formal order for child support in effect during this timeframe, Indiana law imposes a duty, apart from any court order or statute, on parents to provide support for their children. *In re Adoption of N.W.*, 933 N.E.2d 909, 914 (Ind. Ct. App. 2010) (citing *Irvin v. Hood*, 712 N.E.2d 1012, 1015 (Ind. Ct. App. 1999)). When dispensing with a non-custodial parent's consent for failure to support,

> [a] petitioner for adoption must show that the noncustodial parent had the ability to make the payments that she failed to make. *In re Adoption of Augustyniak*, 508 N.E.2d 1307, 1308 (Ind. Ct. App. 1987). A court must look at the totality of the circumstances to determine the parent's ability to pay, not just his or her income (or lack of income). *Id.*

*In re Adoption of I.B.*, 163 N.E.3d at 277.

[19] The only support that Father provided to the Children from March 13, 2019, to March 13, 2020, was food and gifts he brought to the supervised visits. Here,

the trial court determined the items provided at visits were "merely token efforts" insufficient to require Father's consent to the adoption, Appellant's App. Vol. II at 30, and that the Foster Parents proved by clear and convincing evidence that Father failed to support the Children for a year. Father argues that the Foster Parents failed to establish that he had the ability to pay support from March 13, 2019, to March 13, 2020. We agree with Father.

[20] The Foster Parents did not provide any evidence that Father was employed or had any income from March 13, 2019, until his arrest on June 13, 2019, and the totality of the circumstances provides no indication that Father was able to support the Children in this time period. Rather, the record shows that Father was in a relatively dire position in the months leading up to his arrest. Father testified that, at that time, he had "lost everything" and his kidneys and liver were shutting down. Tr. Vol. II at 64. Additionally, although the trial court determined the food and gifts that Father brought to supervised visits were not support, Father stated, "when I would go to the visitation I would bring what I could" because, at that time, he was "still trying to get [his] life together." *Id.* at 77.

[21] On appeal, the Foster Parents claim that "[t]he court found that for at least three months of his time while incarcerated [Father] was able to pay support and failed to do so." Appellee's Br. at 17. The Foster Parents do not provide a citation for this assertion and it is unsupported by the record. The trial court did not make a finding regarding Father's ability to pay support while incarcerated, and the evidence shows the contrary. Father testified that he was

not able to support the Children after he was incarcerated, and the Foster Parents provided no evidence to show otherwise. Although incarceration does not relieve a parent of the duty to support their child, *In re Adoption of T.L.*, 4 N.E.3d 658, 662–63 (Ind. 2014) (quoting *Lambert v. Lambert*, 861 N.E.2d 1176, 1179 (Ind. 2007)), we have no evidence showing that Father could have provided support while he was incarcerated. Thus, the Foster Parents failed to meet their burden to show Father had the ability to pay support, and we conclude that the trial court clearly erred in determining Father failed to support the Children when able to do so for a year.

## Conclusion

[22] The Foster Parents failed to meet their burden to show by clear and convincing evidence that Father failed to communicate significantly with the Children when able to do so and failed to support the Children when able to do so from March 13, 2019, to March 13, 2020. Therefore, we conclude that the trial court clearly erred in determining that Father's consent to the Children's adoption was unnecessary. We reverse the trial court's determination on consent and its grant of the Foster Parents' petitions to adopt the Children.

[23] Reversed.

Vaidik, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Rex L. Patterson
Danielle J. Swan
Patterson Law LLC
Fort Wayne, Indiana


ATTORNEY FOR APPELLEES

Thomas C. Allen
Fort Wayne, Indiana