Arnaldo TRABUCCO, Appellant–
Respondent,

v.

Pamela A. TRABUCCO, Appellee–
Defendant.

No. 03A05–1003–DR–195.

Court of Appeals of Indiana.

March 28, 2011.

Robert A. Garelick, Joshua T. Robertson, Cohen Garelick & Glazier, P.C., Indianapolis, IN, Attorneys for Appellant.

Amy O. Carson, Mitchell & Associates, Indianapolis, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge.

Arnaldo Trabucco ("Husband") appeals from the trial court's amended order dissolving his marriage to Pamela Trabucco ("Wife") and raises three issues, which we restate as:

I. Whether the trial court's use of income averaging to calculate Husband's weekly gross income for child support purposes was clearly erroneous;

II. Whether the trial court erred in including certain assets in the marital pot; and

III. Whether the trial court abused its discretion in valuing certain marital assets.

We affirm in part, reverse in part, and remand with instructions.

### Facts and Procedural History

Husband and Wife were married in August 1988, and two children were born during the marriage. At all times relevant to the case before us, Husband has been a board-certified urologist. Wife does not have a high school diploma, and aside from occasionally assisting with Husband's urology practice, Wife did not work outside the home during the marriage. In 2003, the family relocated from New York City to Columbus, Indiana, where Husband began practicing at Columbus Regional Hospital and Schneck Medical Center.

Wife suffers from a painful, chronic nerve disorder, and during the marriage, she smoked marijuana as a form of pain management with Husband's approval. In early 2005, Husband and Wife were charged with felony possession of marijuana for growing marijuana in their home, and both subsequently pleaded guilty to a lesser-included misdemeanor.

As a result of his arrest, Husband's medical license was suspended for nearly six months before being reinstated on a probationary basis in November 2005. Although all restrictions on Husband's medical license stemming from the arrest and conviction were lifted in December 2007, Husband claims that his criminal conviction has had a significant and continuing negative impact on his medical career, preventing him from maintaining his previous level of employment. Specifically, Husband claims that because of the arrest and conviction, he was not reappointed as a staff physician and lost admitting privileges at Columbus Regional Hospital and Schneck Medical Center. Husband also claims that he was unable to treat certain patients because medical insurance companies refused to reimburse for his services and that he had difficulty obtaining malpractice insurance. Despite all of these problems, Husband's gross annual income as reported on his federal income tax return for 2005 was $203,121.

In 2006, Husband took a job at St. Vincent Jennings Hospital in North Vernon, Indiana, and his reported gross annual income for that year was $311,692. However, Husband was unhappy with this position because St. Vincent Jennings lacked the facilities necessary to perform major surgeries, so he was forced to refer patients in need of such procedures to other physicians. According to Husband, the inability to perform major surgeries put his board certification in jeopardy because he was required to perform a certain number of surgeries within a ten-year period in order to obtain re-certification.

As a result, in March 2007, Husband decided to open a private practice in Sparks, Nevada, called the Urology Institute, LLC ("Urology Institute"). His re-

ported gross annual income for 2007 was $104,026. Husband claims that he is "barely able to meet overhead" at Urology Institute and that he pays himself a salary of $5,000 per month. Appellant's App. p. 203. His reported gross annual income for 2008 was $67,407. However, these figures do not include $275,000 in loans he received from Northern Nevada Medical Center during 2007 and 2008 which were later forgiven.

Wife filed a petition for dissolution of marriage on December 12, 2007. During the pendency of the dissolution proceedings, Husband and Wife agreed to the entry of a mediated provisional order. Under the terms of the order, Husband agreed to transfer $200,000 of the parties' marital assets into a separate account to cover college expenses for the parties' then eighteen-year-old son ("Son"). The parties agreed that any amount remaining in this account upon Son's completion of college would be distributed to Husband and Wife equally. The provisional order also provided that Husband and Wife would both receive early distributions of marital assets in the amount of $125,000 each, and that these early distributions would be "credit[ed] against the ultimate property distribution." Appellant's App. p. 312. It is undisputed that Husband and Wife both received these early distributions.

The final hearing was held in two parts and across five days, on December 9, 10, and 11, 2008, and on June 8 and 9, 2009. On September 29, 2009, the trial court entered its "Final Decree, Including Judgment" ("Decree"), along with special findings of fact and conclusions thereon entered pursuant to Husband's request. The decree provided, in part, that Husband's gross weekly income for child support purposes was $3,967. The trial court arrived at this figure by considering Husband's gross annual incomes as reported on his federal income tax returns from 2004 through 2008, "throwing out" the highest and lowest annual incomes from this period (respectively, 2004 and 2008), and averaging the remaining three gross annual incomes from 2005, 2006, and 2007. Additionally, the $200,000 set aside for Son's college expenses and the $250,000 in early distributions were included within the marital estate, which was divided sixty-four percent to Wife and thirty-six percent to Husband.

Husband filed a motion to correct error on October 29, 2009, alleging in part that the trial court erred in using an income averaging approach to determine his gross weekly income for child support purposes. Husband further alleged that the trial court erred in including the $200,000 set aside for Son's college expenses, the $250,000 in early distributions, a bank account, and various IRAs within the marital estate. Husband also argued that the trial court erred in valuing certain marital assets, including a brokerage account, cash, and a coin collection. After a hearing, the trial court issued an "Order on All Pending Issues, Including Corrected Amended Judgment" ("Amended Judgment") denying Husband's motion to correct error with respect to majority of the above-mentioned arguments. Husband now appeals.[1]

## Standard of Review

In this case, the trial court entered written findings of fact and conclusions pursuant to Husband's request under the provisions of Indiana Trial Rule 52(A). When findings and conclusions thereon are entered by the trial court pursuant to the request of any party to the action, we apply a two-tiered standard of review.

---

1. We heard oral argument on this cause on March 2, 2011, at the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We thank counsel for their advocacy.

*Maloblocki v. Maloblocki,* 646 N.E.2d 358, 361 (Ind.Ct.App.1995).

First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Balicki v. Balicki,* 837 N.E.2d 532, 535–36 (Ind.Ct.App.2005) (quoting *Carmichael v. Siegel,* 754 N.E.2d 619, 625 (Ind.Ct.App. 2001)), *trans. denied.*

■■■■ Additionally, where a trial court has entered special findings at a party's request pursuant to Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind. 1998). Before affirming on a legal theory supported by the findings but not espoused by the trial court, we should be confident that our conclusions are consistent with all of the trial court's findings of fact and the reasonable inferences flowing therefrom. *Id.*

### I. Income Averaging

■■■■ Husband first argues that the trial court's use of income averaging to calculate his child support obligation was clearly erroneous and that the trial court should have instead based its child support calculation on his "actual income at the time of trial," which he claims was $67,407, the amount he reported as gross income on his 2008 federal income tax return. Appellant's Br. at 32, Appellant's App. p. 67. A trial court's calculation of a child support obligation is presumptively valid and will be reversed only if it is clearly erroneous or contrary to law. *Young v. Young,* 891 N.E.2d 1045, 1047 (Ind.2008). A decision is clearly erroneous if it is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.*

■■■■ The first step in establishing a child support obligation is to determine each parent's weekly gross income. *Scott v. Scott,* 668 N.E.2d 691, 696–97 (Ind.Ct. App.1996). Indiana Child Support Guideline 3(A) sets forth the following definitions of weekly gross income:

1. *Definition of Weekly Gross Income.* ... For purposes of these Guidelines, "weekly gross income" is defined as actual Weekly Gross Income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon "in-kind" benefits. ...

2. *Self–Employment, Business Expenses, In–Kind Payments and Related Issues.* Weekly Gross Income from self-employment [or] operation of a business ... is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income. ...

3. *Unemployed, Underemployed and Potential Income.* If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income.

Ind. Child Support Guideline 3(A).

 Husband asserts that the trial court's use of income averaging to calculate his weekly gross income amounted to an imputation of potential income to him and that such imputation was clear error because he is not voluntarily unemployed or underemployed. One of the purposes behind imputing potential income is "to discourage a parent from taking a lower paying job to avoid the payment of significant support." Child Supp. G. 3 cmt. 2(c). However, "[c]hild support orders cannot be used to force parents to work to their full economic potential or make their career decisions based strictly upon the size of potential paychecks." *Elliott v. Elliott,* 634 N.E.2d 1345, 1349 (Ind.Ct.App.1994). Where a parent is unemployed or underemployed for a legitimate purpose other than avoiding child support, there are no grounds for imputing potential income. *Kondamuri v. Kondamuri,* 852 N.E.2d 939, 950 (Ind.Ct.App.2006).

In support of his argument that the trial court erroneously imputed potential income to him, Husband relies heavily on *Lambert v. Lambert,* a child support case in which the father was incarcerated prior to the entry of the final decree of dissolution. 861 N.E.2d 1176, 1177 (Ind.2007). Despite the father's inability to work due to his incarceration, the trial court imputed his pre-incarceration income for the purposes of calculating his child support obligation. *Id.* A divided panel of this court affirmed, concluding that the father's criminal activity and resulting incarceration constituted voluntary unemployment for the purposes of the Guidelines. *Id.* Our supreme court granted transfer and reversed the trial court, holding that while incarceration does not relieve parents of their child support obligations, courts should not impute potential income to an imprisoned parent based on pre-incarceration wages or other employment-related income. *Id.* Rather, trial courts should calculate support based on the actual income and assets available to the child support obligor. *Id.* at 1177.

Husband argues that this case is analogous to *Lambert* because his reduced earnings are attributable to his arrest and conviction on the marijuana charges.[2] Husband argues further that the trial court should have based Husband's child support obligation on his actual income at the time of trial, which he apparently claims was $67,407, the gross income figure he reported on his 2008 federal income tax return. Wife responds that the major reduction in Husband's income in 2008 was not attributable to the marijuana arrest and conviction, but was instead a result of Husband's choice to open a private practice rather than retain his position at St. Vincent Jennings Hospital. Wife also argues that *Lambert* is inapplicable because Husband is not incarcerated and, with the exception of six months during which his medical license was suspended, he has con-

---

**2.** Husband also briefly asserts that Wife's behavior caused a reduction in Husband's earning ability. Specifically, he claims that Wife contacted the hospital in Sparks and falsely reported that Husband was using drugs. As a result, Husband's hospital privileges were briefly suspended and Husband was required to undergo drug testing. Husband also claims that as a result of Wife's statements, physicians stopped referring patients to him and certain anesthesiologists refused to work with him. However, Husband has developed no independent argument concerning the impact, if any, Wife's conduct should have on his child support obligation, so we do not address the issue separately.

tinued to earn income through the practice of medicine throughout the entirety of the more than three years that have passed since his initial arrest on the marijuana charges.

There is support in the record for Wife's assertion that Husband's reduced income was a result of his choice to open a private practice rather than work as a hospital employee in North Vernon. But even so, as noted above, parents may have legitimate reasons for choosing lower-paying jobs, and child support orders are not to be used to force non-custodial parents to make career choices based on salary alone. Here, it appears that Husband had a legitimate reason for leaving his position at St. Vincent Jennings Hospital other than the avoidance of a higher child support obligation. Specifically, Husband testified that he was unable to perform the requisite number of surgeries at St. Vincent Jennings to retain his board certification, and that he was concerned that he would lose his surgical skills due to nonuse. Wife has not directed our attention to any evidence in the record to contradict Husband's testimony in this regard.

Nevertheless, *Lambert* is readily distinguishable from the case at hand, and for a more fundamental reason than that stated by Wife. In *Lambert*, the trial court imputed the father's pre-incarceration income, even in the face of clear evidence that his income was reduced to virtually nothing due to his incarceration. Husband's entire argument assumes that the trial court's use of income averaging resulted in a similar imputation of potential income to him. But here, Husband failed to present adequate evidence to allow the trial court to determine his actual income at the time of the final hearing. In support of its use of income averaging, the trial court found in its Decree that Husband's income for child support purposes was "difficult to ascer-

tain," but that Husband "is capable of earning as little or as much as he chooses." Appellant's App. p. 25. The court found further that "[a]lthough income averaging' is not the most effective and reliable means of calculating an individual's gross income for payment of child support, in this case, there appears to be no more reliable method." *Id.*

The record contains abundant evidence supporting the trial court's finding that Husband's income from self-employment was difficult to ascertain. Specifically, although Husband testified that he pays himself a salary of $5,000 per month, he also testified that he regularly uses his business accounts to pay personal expenses, including rent, vehicle, health care, credit card, and other expenses. Furthermore, Husband testified that in 2007 and 2008, he received $275,000 in loans from the Northern Nevada Medical Center, and although the loans were later forgiven, they were not listed as income on any of his federal income tax returns submitted to the trial court.

Thus, it appears that the trial court used income averaging to ascertain Husband's *actual* income, not to impute unearned potential income to him. In light of Husband's failure to present evidence to the trial court adequately documenting his actual income, we cannot conclude that the trial court's use of income averaging was clearly erroneous. And even if the trial court's use of income averaging had resulted in an erroneous imputation of potential income, Husband invited the error by failing to present sufficient evidence of his actual income. *See Reinhart v. Reinhart,* 938 N.E.2d 788, 791 (Ind.Ct.App.2010) ("Under the invited error doctrine, a party may not take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct.").

Moreover, this court has previously endorsed the use of income averaging to determine gross weekly income for child support obligors who are, like Husband, self-employed. Wife directs our attention to one such case, *Bower v. Bower*, in which the father was a self-employed commodities broker whose income was based upon the number of commodity trades he made for his clients. 697 N.E.2d 110, 113 (Ind. Ct.App.1998). The mother filed a petition seeking an upward modification of father's existing child support order, which the trial court granted. *Id.* However, in determining the father's income, the trial court used an average of the father's incomes over the previous five years. *Id.* On appeal, the mother argued that the trial court's use of income averaging resulted in an inadequate child support order because it created an artificial income figure that was approximately $87,000 less than the father's actual income during the most recent year. *Id.*

This court upheld the trial court's use of income averaging, noting that the Child Support Guidelines "caution the courts to use care in determining income of self-employed individuals, especially when part or all of the income is contingent upon the production of the individual." *Id.* This court held that the trial court did not err in determining that income averaging was the most accurate way to determine the father's income in light of the volatility of the commodity trading business, the sizable variations in the husband's income over the past five years, and the difficulty involved in predicting his future income. *Id.* at 114.

Husband argues that *Bower* is distinguishable because, here, Husband did not hold the same position during the three years the trial court used to average his income. Rather, Husband argues that he "went from being self-employed in Indiana, to being unemployed for a period after his arrest, to being an employee of a hospital in Indiana, to opening his own practice from scratch' in Nevada." Reply Br. at 6. Under the facts and circumstances before us, we conclude that this is a distinction without a difference. This court's decision in *Bower* was not predicated on the husband's continuing to maintain the same position; rather, it was based on the difficulty in predicting his future income, which was due to the volatility of the industry in which he worked. Here, although Husband has changed jobs during the relevant time frame, he has continued to work in the same profession. Furthermore, Husband's choice to change jobs has only contributed to the unpredictability in his income.

Husband also argues that *Bower* is inapposite because he is not employed in a highly volatile industry like commodities trading. However, all forms of self-employment create some level of unpredictability in income, and such factual determinations are best left to the trial court. Moreover, the marked fluctuations in Husband's gross annual incomes over the past five years support the conclusion that Husband's income was indeed unpredictable and "difficult to ascertain[.]" Appellant's App. p. 25. Thus, *Bower* is not so distinguishable as to be inapplicable to this case.

Additionally, at least one case has interpreted the commentary to the Child Support Guidelines as "mak[ing] the suggestion to income average or view more than one year in the context of verifying income for self-employed obligors." *Lloyd v. Lloyd,* 755 N.E.2d 1165, 1170 (Ind.Ct.App. 2001) (citing Child Supp. G. 3(B), cmt. 2 ("One pay stub standing alone can be very misleading, as can other forms of documentation.... When in doubt, it is suggested that income tax returns for the last two or three years be reviewed.")). In

light of Husband's self-employment, the significant fluctuations in his income over the past several years, and his failure to adequately document his actual income at the time of the final hearing, the trial court's decision to use an income averaging approach to calculate Husband's weekly gross income for child support purposes was not clear error. *See also In re Paternity of G.R.G.*, 829 N.E.2d 114, 119 (Ind. Ct.App.2005) (trial court's use of income averaging to calculate father's weekly gross income was not error); *Lloyd*, 755 N.E.2d at 1170–71 (same).[3]

## II. Marital Pot

 Next, Husband argues that the trial court erred in including several assets in the marital pot. In Indiana, it is well-established that all marital property goes into the marital pot for division, whether it was owned by either spouse prior to the marriage, acquired by either spouse after the marriage and prior to the parties' final separation, or acquired by their joint efforts. *Hill v. Hill*, 863 N.E.2d 456, 460 (Ind.Ct.App.2007); *see also* Ind.Code § 31–15–7–4(a) (2008). This "one-pot" theory ensures that all of the parties' assets are subject to the trial court's power to divide and award. *Hill*, 863 N.E.2d at 460. "While the trial court may ultimately determine that a particular asset should be awarded solely to one spouse, it must first include the asset in its consideration of the marital estate to be divided." *Id.*

### A. Son's College Account

 Husband first argues that the trial court abused its discretion by including the $200,000 set aside for Son's college expenses within the marital pot. Specifically, the provisional order provided that "Husband shall put $200,000 of the parties' marital assets into a separate account for these expenses. Any costs remaining in this account, upon [Son's] completion of college, shall immediately distributed [sic] to the parties equally." Appellant's App. p. 310. Nevertheless, the trial court included the full $200,000 in the marital estate, which was divided with sixty-four percent going to Wife and the remaining thirty-six percent going to Husband.

Husband does not dispute that the college account was funded with marital assets, but nonetheless argues that the trial court's decision to include the college account within the marital estate is against the public policy favoring amicable resolution of disputes concerning the property rights of parties to dissolution proceedings.

---

3. Husband also cites the following provision of the commentary to the Child Support Guidelines:

 When the court determines that it is appropriate to include irregular income, an equitable method of treating such income may be to require the obligor to pay a fixed percentage of overtime, bonuses, etc., in child support on a periodic but predetermined basis (weekly, bi-weekly, monthly, quarterly) rather than by the process of determining the average of the irregular income by past history and including it in the obligor's gross income calculation.

 Child Supp. G. 3(A), cmt. 2(b). However, it does not appear that this provision applies to the type of income Husband earns. In describing "irregular income," the same com-

ment provides that "[o]vertime, commissions, bonuses, periodic partnership distributions, voluntary extra work and extra hours worked by a professional are all illustrations, but far from an all-inclusive list" of types of irregular income. Husband makes no attempt to explain why his income from self-employment should fall within this category. Moreover, even if Husband's income qualifies as irregular income, the above-mentioned comment simply suggests that requiring the obligor to pay a fixed percentage of his or her irregular income is an equitable way to treat such income. While the comment arguably expresses a preference for dealing with irregular income in this fashion, it does not preclude the use of averaging. We therefore find Husband's argument unpersuasive.

In support of this argument, Husband cites *Atkins v. Atkins*, in which this court noted that "[t]he public policy of this state favors the amicable settlement by written agreement of the property rights of those citizens who are having their marriages dissolved." 534 N.E.2d 760, 762 (Ind.Ct. App.1989), *trans. denied.* Husband also cites Indiana Code section 31–15–2–17 (2008), which provides in pertinent part:

 (a) To promote the amicable settlements of disputes that have arisen or may arise between the parties to a marriage attendant upon the dissolution of their marriage, the parties may agree in writing to provisions for:

 * * *

 (2) the disposition of any property owned by either or both of the parties[.]

 * * *

 (b) In an action for dissolution of marriage:

 (1) the terms of the agreement, if approved by the court, shall be incorporated and merged into the decree and the parties shall be ordered to perform the terms[.]

Although it is true that public policy favors the amicable resolution of disputes surrounding the division of marital property, the case and statute cited by Husband are inapplicable to the case before us. Both refer to agreements that are incorporated into a trial court's **final** decree of dissolution. Here, the provisional order was not incorporated into the Decree. And because the account was funded with marital assets, the policies behind Indiana's one-pot theory require its inclusion within the marital estate.

Husband also argues that trial court erred in including the college account within the marital pot because the provisional order had already effected a final distribution of the funds, and the trial court was bound to follow its own order. In support of this argument, Husband cites *Nornes v. Nornes,* 884 N.E.2d 886 (Ind.Ct.App.2008). In *Nornes,* the parties stipulated to the division of the entire marital estate, with the exception of the wife's student loans. *Id.* at 887. The trial court's final decree incorporated the parties' agreement and required the wife to pay the entirety of her student loan liabilities. *Id.* at 887–88. This court held that:

 *in the absence of an agreement of the parties to the contrary,* where the parties divide between themselves a part of the marital estate and leave the division of the balance to the discretion of the trial court, the trial court should assume that the property that the parties have already divided was divided justly and reasonably and shall divide the remainder of the assets and liabilities of the parties as if they were the entirety of the marital estate.

*Id.* at 889 (emphasis in original). Thus, because the wife's student loans were marital obligations, the trial court erred by requiring the wife to be solely responsible for them without finding that a deviation from the statutory presumption in favor of a fifty/fifty split was warranted. *Id.*

*Nornes* is easily distinguishable from the case at hand. Again, *Nornes* dealt with an agreement of the parties that was incorporated into the trial court's final decree of dissolution. But as noted above, the provisional order was not incorporated into the trial court's final decree of dissolution in this case. Moreover, the language of the provisional order itself undermines Husband's argument that the provisional order effected a final distribution of the marital assets at issue. The introductory language of the provisional order provides that the parties agreed to its terms "until modified or the entry of the *Decree of*

*Marriage Dissolution* [.]" Appellant's App. p. 308 (emphasis in original). Thus, the parties agreed that the terms of the provisional order would not survive the trial court's entry of a final decree of dissolution.

■■■ Finally, case law and statute both specifically provide that provisional orders terminate upon the entry of the final decree of dissolution. *See* Ind.Code § 31–15–4–14 (2008) (provisional orders terminate upon the entry of the final decree or the dismissal of the petition for dissolution or legal separation); *Dillon v. Dillon,* 696 N.E.2d 85, 87 (Ind.Ct.App.1998) ("In general, provisional orders terminate when a final decree is entered or when a petition for dissolution or legal separation is dismissed."). *See also* Ind.Code § 31–15–4–13 (2008) ("The issuance of a provisional order is without prejudice to the rights of the parties or the child as adjudicated at the final hearing in the proceeding."). We therefore conclude that the provisional order did not effect a final distribution of the funds placed in Son's college account, and that trial court did not err in including those funds within the marital estate.

### B. *Early Distributions*

■■ Next, Husband argues that by including the $250,000 in early distributions within the marital estate, the trial court erroneously "double counted" the money that was used to make the early distributions.[4] Wife counters that because Husband was unable to articulate or provide documentation regarding the source of the majority of the funds, there must have been additional, unidentified assets from the parties' marital estate to cover the early distributions.

It is undisputed that both parties received the early distributions set forth in the provisional agreement. Husband argues that all of the money "had to come from existing marital estate assets regardless of whether Husband could remember from which accounts he took the money to pay himself and the remainder of what he owed to Wife." Appellant's Br. at 35. However, because of Husband's inability to specify the accounts from which the majority of the funds were withdrawn, we cannot conclude that the trial court erred in concluding that they must have been withdrawn from additional, undisclosed marital assets.

In the alternative, Husband argues that the trial court should not have included the entire $250,000 within the marital estate because the evidence established that a portion of the funds came from existing marital assets. Wife concedes that she obtained the first $12,500 of her $125,000 distribution from one of the marital bank accounts and that, as a result, $12,500 of her early distribution was double counted. We cannot agree with Wife's concession. The parties agree that the money was withdrawn from their joint Home Federal bank account. There are two Home Federal bank accounts listed in the trial court's final property distribution, both of which are valued at $0.00. Appellant's App. p. 30. Thus, the $12,500 distributed to Wife from the Home Federal account was not double counted.

Additionally, Husband points out that in Wife's proposed findings of fact, Wife conceded that she received another

---

4. Husband also argues that the trial court erred in including the $250,000 in early distributions within the marital estate because the provisional order effected a final distribution of the funds. Husband made the same argument with regard to Son's college account, and we reject his argument with regard to the early distributions for the same reasons.

$111,498.74 toward her early distribution from a separate marital bank account, Bank of America checking account number 8815, which was in turn funded by transfers from another marital bank account, Bank of America savings account number 9280 (collectively, the "Bank of America Accounts"). This is corroborated by a bank statement from May 2008, which shows a wire transfer from the Bank of America checking account in the amount of $111,498.74 to Pamela Trabucco. *Id.* at 384. According to Husband, by including this portion of Wife's early distribution as well the Bank of America accounts within the marital estate, the trial court double counted the portion of Wife's early distribution withdrawn from the Bank of America Accounts.

However, it does not appear that trial court's final valuation of the Bank of America accounts included the $111,498.74 distributed to Wife. On December 6, 2007, approximately one week prior to the date of filing, the combined balance of the Bank of America Accounts was $48,455.22. By May 2009, the balance had increased to $161,059.08, and after the wire transfer to Wife, the balance was $65,828.84. Nevertheless, the trial court assigned a combined value of $32,731.50 to the Bank of America Accounts. We therefore conclude that the trial court's valuation of the Bank of America Accounts did not include the $111,498.74 transferred to Wife as part of her early distribution and, therefore, that figure was not double counted.

## C. *Account # 0887*

Next, Husband argues that the trial court erred by including U.S. Bank account number 0887 ("Account # 0887") within the marital estate. Specifically, Husband argues that the trial court erred in including Account # 0887 within the marital estate because Wife failed to pres-

ent any evidence to establish the ownership, value, or existence of the account as of the date of filing. However, at trial, Wife presented documentation showing that in October 2007, less than two months prior to the date of filing, Husband transferred a total of $88,999.00 into Account # 0887 from a marital bank account. Husband appears to argue that in order to support the trial court's finding, Wife was required to submit additional evidence regarding the account, apparently in the form of a bank statement. Husband's argument is simply a request to reweigh the evidence, which we will not do on appeal. The evidence presented by Wife was sufficient to give rise to a reasonable inference that Account # 0887 existed and was a marital asset subject to division pursuant to Indiana's one-pot theory.

## D. *Wells Fargo IRAs*

Next, Husband argues that the trial court erred in including two Wells Fargo IRAs within the marital estate. First, Husband argues that the trial court erred in including Wells Fargo IRA account number 1941 ("IRA # 1941"), valued at $3,000.49, within the marital estate because the evidence presented at trial established that IRA # 1941 was not opened until after the date of filing. Wife responds that the trial court did not err in including the IRA within the marital estate because there was sufficient evidence to support the trial court's finding that that the IRA was funded with marital assets.

At trial, Husband's expert certified public accountant, Steven Stuckey, testified that IRA # 1941 was opened in January 2008, slightly after the date of filing. In her proposed findings of fact, Wife conceded that she could not prove that IRA # 1941 was a marital asset. Nevertheless, the trial court included IRA # 1941 within the marital estate and found in its Amend-

ed Judgment that "[t]he evidence was clear this account was opened with funds from the marital estate." Appellant's App. p. 70.

At the final hearing, Husband testified at length regarding his allegedly dire financial condition after the petition for dissolution was filed. Regarding his business, Husband testified that he was "barely able to make overhead" and could only pay himself $5,000 per month. Although Husband received additional money in the form of loans from Northern Nevada Medical Center, he testified that he tried to keep use of these funds to a minimum because he was unaware at that time that the loans would eventually be forgiven. Based on this evidence, Wife argues that it is highly unlikely that Husband could have funded IRA # 1941 with anything other than marital assets. In light of this evidence and our deferential standard of review, we cannot conclude that the trial court's finding that IRA # 1941 was funded with marital assets was clearly erroneous.

Second, Husband argues that the trial court erred by including Wells Fargo IRA account number 5137 ("IRA # 5137"), valued at $18,885.43, within the marital estate. Husband argues that IRA # 5137 was established after the date of filing to consolidate three smaller, preexisting IRAs. Specifically, he claims that IRA # 5137 was composed of the following three IRAs: (1) Home Federal IRA account number 5613 (the "Home Federal IRA"), (2) Chase IRA account number 3657 (the "Chase IRA"), and (3) IRA # 1941. In its Decree, the trial court not only included IRA # 5137 within the marital estate, but also separately included the three IRAs that Husband claims were consolidated into IRA # 5137.

In his motion to correct error, Husband argued that the Chase IRA had a value of $0.00 on the date of filing, but he did not explain what had happened to the funds or whether they had been consolidated into another IRA. In its Amended Judgment, the trial court sustained Husband's motion to correct error in this regard and valued the Chase IRA at $0.00, concluding that the balance of the Chase IRA was included within another asset, "the Bank One IRA, Number 5619 or 6519, listed as (bb) in the Amended Decree." Appellant's App. p. 70. Thus, even assuming that the Chase IRA was actually consolidated into IRA # 5137, it was not double counted because the trial court assigned it a separate value of $0.00 in its Amended Judgment. Therefore, Husband's argument with regard to the alleged double counting of the Chase IRA is without merit.

Husband's argument with regard to the alleged double counting of the Home Federal IRA and IRA # 1941 is more convincing. Husband has directed our attention to testimony supporting his assertion that both of these IRAs were consolidated into IRA # 5137, and Wife does not dispute this assertion or direct our attention to any contradictory evidence. Nevertheless, the trial court included IRA # 5137 as well as the Home Federal IRA and IRA # 1941 within the marital estate. Because it appears that the trial court may have inadvertently double counted the Home Federal IRA and IRA # 1941, we remand to the trial court with instructions to consider whether the Home Federal IRA and IRA # 1941 were consolidated into IRA # 5137 and should therefore not be counted separately.

### III. Valuation of Marital Assets

▮▮▮ Next, Husband argues that the trial court abused its discretion in valuing certain marital assets. The trial court has broad discretion in ascertaining the value of property in a dissolution action, and its valuation will only be disturbed for an

abuse of that discretion. *Hartley v. Hartley*, 862 N.E.2d 274, 283 (Ind.Ct.App.2007). In other words, we will reverse only where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). A trial court does not abuse its discretion if its decision is supported by sufficient evidence or reasonable inferences therefrom. *Id.* In our review of the trial court's valuation decision, we will not weigh evidence, but will consider the evidence in a light most favorable to the judgment. *Id.*

## A. E*Trade Account

 Husband first argues that the trial court abused its discretion in valuing an online brokerage account (the "E*Trade Account") as of the date of filing rather than the date of the final hearing. The trial court has discretion to value the marital assets at any date between the date of filing and the date of the final hearing, and we will reverse the trial court's decision as to a valuation date only where it is clearly against the logic and effect of the facts and circumstances before the trial court. *Reese v. Reese*, 671 N.E.2d 187, 191 (Ind.Ct.App.1996), *trans. denied.* Although the date selected for the valuation of an asset has the effect of allocating the risk of a change in the asset's value to one party or the other, this allocation of risk is entrusted to the discretion of the trial court. *Id.* The choice to assign an early valuation date to an asset that later decreases in value is not necessarily an abuse of discretion. *Id.*

In its Decree, the trial court noted that the parties had agreed that all marital assets, with the exception of the E*Trade Account, should be valued as of the date of filing. Husband requested that the trial court value the E*Trade Account as of December 4, 2008, when he claims the

value of the account was $97,470.00. Wife, on the other hand, argued that the trial court should value the E*Trade Account as of the date of filing, at which time the value of the account was $325,132.46. The trial court declined to assign a different valuation date to the E*Trade Account and valued it at as of the date of filing.

On appeal, Husband argues that the trial court abused its discretion in valuing the E*Trade account as of the date of filing rather than the date of the final hearing. Although Husband admits to withdrawing $50,847 from the E*Trade account during the pendency of the dissolution proceedings, he maintains that the remaining $176,815 decline in the account's value was "due solely to market forces." Appellant's Br. at 40. Accordingly, Husband contends that the trial court abused its discretion by failing to value the E*Trade Account at $148,317.46, the sum of the alleged value of the account as of December 4, 2008 and Husband's withdrawals from the account.

Our supreme court's decision in *Quillen* dictates the opposite conclusion. *See* 671 N.E.2d at 100–03. In *Quillen*, the sole source of the parties' income was a jointly-owned and operated home construction business. *Id* at 100. The trial court valued the business as of the date of filing, despite a major decline in its value during the dissolution proceedings due to the husband's ceasing to operate the business and his arrest and possible future incarceration for sex offenses allegedly committed against one of the parties' daughters. *Quillen v. Quillen*, 659 N.E.2d 566, 570–73 (Ind.Ct.App.1995), *trans. granted, opinion vacated in relevant part.*

On appeal, a divided panel of this court held that "where, as here, the value of a marital asset changes radically between the date of final separation and the final hearing, it is an abuse of the trial court's discretion to select a valuation date that

does not account for the events contributing to that change." *Id.* at 573. Judge Hoffman dissented, arguing that the majority had improperly reweighed the evidence and modified the principle that the trial court has discretion to value marital assets on any date between the date of filing and the date of the final hearing. *Id.* at 579–80.

Our supreme court granted transfer and agreed with Judge Hoffman, affirming the trial court. *Quillen,* 671 N.E.2d at 99–100. In holding that this court's majority opinion impermissibly impinged upon the discretion of the trial court, our supreme court reiterated that the selection of a valuation date for a particular marital asset has the effect of allocating the risk of change in the value of that asset during the pendency of the proceedings, and that the allocation of such risk is entrusted to the discretion of the trial court. *Id.* at 103.

Similarly, in *Reese,* the trial court valued the parties' business as of the date of filing, although environmental regulations enacted during the pendency of the dissolution proceedings had a significant negative impact on the value of the business. 671 N.E.2d at 189–90. In selecting the valuation date, the trial court reasoned that the husband should bear the risk of any decline in the value of the business during the dissolution proceedings because he alone exercised complete control over the business and had the power to sell it before its value dropped too low. *Id.* at 191–92. This court affirmed, concluding that because there was evidence in the record to support the trial court's determination that the husband exercised control over the business, the trial court's allocation of risk as reflected in its chosen valuation date was not an abuse of discretion. *Id.* at 192.

Relying on *Reese,* Wife argues that the trial court properly concluded that Husband should bear the risk of any decline in the account's value during the pendency of the proceedings because he exercised exclusive control over the E*Trade account. At oral argument, Husband's counsel conceded that Husband exercised control over the account, and there is evidence in the record to support this concession. Specifically, only Husband's name appears on the account statements, and Husband admitted to having access to the account and withdrawing over $50,000 during the course of the dissolution proceedings, apparently in violation of a temporary restraining order prohibiting both parties from "[c]oncealing, transferring, destroying, encumbering, selling or otherwise disposing of any marital property ... except in the normal course of business or for the necessities of life" without the consent of the other. Appellant's App. p. 310. Additionally, both here and in *Reese,* the decline in the value of the asset was due to forces outside of the parties' control: in this case, the decline in the stock market, and in *Reese,* the enactment of new environmental regulations. We therefore conclude that under *Quillen* and *Reese,* the trial court acted well within its discretion when it decided to value the account as of the date of filing instead of the date of the final hearing.

Nevertheless, Husband argues that the trial court's chosen valuation date was an abuse of discretion because it unjustly failed to account for a significant decrease in the value of the E*Trade Account. In support of his argument, Husband cites *Knotts v. Knotts,* in which the wife argued that the trial court abused its discretion in valuing an option to purchase stock as of the date of filing because the valuation date failed to account for a significant increase in the asset's value during the pendency of the dissolution proceedings. 693

N.E.2d 962, 968 (Ind.Ct.App.1998), *trans. denied.* This court recognized the trial court's broad discretion with regard to setting a valuation date, as set forth in *Quillen,* but reasoned that "we do not believe that this discretion afforded trial judges is inconsistent with their ability to select a date which would avoid injustice." *Id.* at 968–69. The court went on to note, in dicta, that "it is possible for a court to abuse its discretion in picking a date which unjustly fails to account for a significant *increase* in the value of an asset during the proceedings." [5] *Id.* at 969 (emphasis added). However, the court did not confront the issue because the record did not contain any documentation of the closing price of the stock on the date of the property distribution. *Id.*

Husband asserts that the inverse of this court's statement in *Knotts* is also true, i.e. that a trial court may abuse its discretion by choosing a valuation date which unjustly fails to account for a significant *decrease* in an asset's value during the pendency of dissolution proceedings. Husband argues further that the trial court's valuation date for the E*Trade account was an abuse of discretion because it unjustly fails to account for a decline in the account's value that was "outside the control of either party." Appellant's Br. at 41.

In light of our supreme court's holding in *Quillen* and this court's decision in *Reese,* we decline to extend the *Knotts* dictum to cover the facts of this case. And even if we were inclined to extend *Knotts,* the trial court's allocation of the risk of a change in the value of the E*Trade Account to Husband was not unjust in light of his control over the account. We con-

clude that the trial court's decision to value the E*Trade Account as of the date of filing rather than the date of the final hearing was not an abuse of discretion.

### B. *Cash on Hand*

██ Next, Husband argues that the trial court abused its discretion by valuing the parties' "cash on hand" at $180,000 "because the parties expressly stipulated at trial that the value of the cash on hand was $160,000 and no evidence was introduced at trial that there was an extra $20,000 in the marital estate." Appellant's Br. at 41. In support of this assertion, Husband directs our attention to his and Wife's marital balance sheets, both of which reflect the value of the cash on hand to be $160,000. Husband also cites to a portion of the transcript in which the trial court asked the parties whether there was a dispute concerning the amount of cash on hand, which Husband claimed to be $160,000, and Wife's counsel responded, "No." Appellant's App. p. 187. The trial court then stated "On to the next issue. We're good on $160,000." *Id.* at 188.

Wife contends that she had no way to determine the accuracy of the $160,000 amount disclosed by Husband and therefore relied on his statements in preparing her marital balance sheet prior to the final hearing. However, Wife directs our attention to a portion of the transcript of the final hearing in which Husband testified that he withdrew $21,485.45 from the parties' Huntington Bank account. Husband, Husband's counsel, and the trial court then engaged in the following exchange:

---

5. Although the *Knotts* court labeled this conclusion a holding, it went on to conclude that the case before it did not present such an issue. 693 N.E.2d at 969. Thus, the statement is obiter dictum, and therefore not binding. *See* BLACK'S LAW DICTIONARY (9th ed.2009) (defining obiter dictum as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive).").

Q: Do you know where that money went?

A: Probably into the cash account.

Q: The cash account?

A: Yes.

Q: What cash account?

A: The cash I reported on my disclosure.

Q: The $116,000? [sic]

A: Correct.

THE COURT: It went into cash cash?

A: Probably.

THE COURT: As in U.S. currency?

A: Yes.

THE COURT: Next question.

Q: You reported that you had $160,000 in cash prior on, what was it, well prior to 4/25/08, so now it would [be] your testimony that you added another $21,000 to the cash, that would bring your total cash to $181,000 sir is that correct?

A: Well I must be mistaken, I'd have to retract that statement, I'd have to say I don't know exactly where it went.

Appellee's App. pp. 27–28.

Although Husband eventually backtracked and stated that he must have been mistaken about withdrawing the money and adding it to his "cash account," the trial court was not required to believe that portion of Husband's testimony. Based on the foregoing evidence, it was reasonable for the trial court to infer that Husband had in fact withdrawn an additional $21,485.45 from the Huntington Bank account. It was also reasonable for the trial court to round this figure, in accordance with Wife's proposed findings of fact, to $20,000 before adding it to the $160,000 Husband had already disclosed. Accordingly, we conclude that the trial court did not abuse its discretion in valuing the cash on hand.[6]

Husband also argues that the trial court's findings were insufficient to support its valuation of the cash on hand. In support of this argument, Husband cites *Erb v. Erb* for the rule that special findings entered pursuant to a party's request under Trial Rule 52(A) "must contain all facts necessary to recovery by a party and the ultimate facts from which the court has determined the legal rights of the parties.'" 815 N.E.2d 1027, 1031 (Ind.Ct. App.2004) (quoting *In re Estate of Inlow*, 735 N.E.2d 240, 250 (Ind.Ct.App.2000)). In *Erb*, the trial court entered findings of fact and conclusions of law pursuant to the husband's request. *Id.* at 1028. However, those findings did not include the trial court's calculation of the marital estate and on appeal, this court was unable to discern how the trial court determined the value of the marital estate. *Id.* at 1030. This court concluded that the deficiencies in the trial court's findings made them insufficient to allow for meaningful appellate review, and remanded the case to the trial court with instructions to include its calcu-

---

**6.** At oral argument, Husband's counsel also argued that by adding the money withdrawn from the Huntington Bank account to the parties' cash on hand as well as separately including the Huntington Bank account in its final property distribution, the trial court erroneously double counted this asset. However, Husband failed to raise this issue in his appellant's brief or reply brief, instead raising the issue for the first time on rebuttal at oral argument. We fail to see what prevented Husband from advancing this argument in his briefs, and Husband's delay in presenting the argument deprived Wife of the opportunity to respond to it. We therefore decline to address Husband's argument regarding the alleged double counting of the Huntington Bank account. *Cf. Chupp v. State*, 830 N.E.2d 119, 126 (Ind.Ct.App.2005) (issues not raised in an appellant's brief may not be raised for the first time in a reply brief or by filing a citation to additional authority).

lation of the marital estate in its findings and conclusions.

Here, the trial court found in its Decree that the value of the cash on hand was $180,000, but entered no further findings explaining how it had come to that conclusion. In his motion to correct error, Husband argued that the trial court erred in valuing the cash on hand at $180,000 because both Husband's and Wife's marital balance sheets listed the value of the cash as $160,000 and because "[a] review of [Husband's] trial notes and exhibits does not reflect any evidence of an additional $20,000 in cash, and based upon this, the unrefuted evidence is that the correct value of the parties' cash on hand totaled $160,000." Appellant's App. p. 42. In her response to Husband's motion to correct error, Wife argued that "[Husband] himself testified that he had an additional $20,000.00 in cash on hand." *Id.* at 56. In its Amended Judgment, the trial court declined Husband's request to "correct" the valuation, finding that the greater weight of the evidence at the final hearing supported a finding that there was a total of $180,000 in cash on hand. *Id.* at 68.

" 'Trial Rule 52(A) is a method for formulating the ruling of the trial court, providing more specific information for the parties, and establishing a particularized statement for examination on appeal.' " *Erb*, 815 N.E.2d at 1030 (quoting *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998)). Here, although the trial court did not reference the specific evidentiary facts giving rise to its conclusion that the greater weight of the evidence at the final hearing supported a finding that the cash on hand totaled $180,000, the omission is not so glaring as to prevent meaningful appellate review. Unlike in *Erb*, in light of Wife's response to Husband's motion to correct error and the above-cited portion of the transcript, we are able to deduce the

basis for the trial court's conclusion and to determine that the trial court's valuation was supported by the evidence. We therefore conclude that the trial court's findings were sufficient to support its valuation of the cash on hand.

### C. *Coin Collection*

■ Finally, Husband argues that the trial court abused its discretion in valuing a coin collection at $17,311.95. At trial, Husband entered into evidence an appraisal estimating the value of the coin collection to be $4,275.00. Wife, however, argued that the value of the coin collection was $52,983.10. The number of coins in the marital estate was heavily disputed at trial. Wife presented evidence that Husband had purchased $25,094.55 worth of coins in April of 2006, but Husband testified that he sold a majority of those coins prior to the date of filing. Wife presented additional evidence of numerous coin purchases made by Husband, but neither Husband nor Wife could establish when those coins were purchased. Husband and Wife both admitted that they were unable to pinpoint exactly what coins the parties owned as of the date of filing, and Husband acknowledged that his appraisal did not include a number of coins that he claims were stolen during a burglary of his home in Sparks, Nevada that took place after the date of filing.

Here, the trial court adopted neither Husband's nor Wife's valuation of the coin collection. Instead, it valued the coins at $17,311.95. In his motion to correct error, Husband argued that the trial court should have valued the coins at $4,275.00, contending that Wife had not challenged his appraisal and had used this figure in her proposed findings of fact. To the contrary, Wife vigorously disputed Husband's valuation of the coin collection at trial. And in her proposed findings of fact,

Wife's estimated values for the various coins she claimed were part of the marital estate, which included the coins that were subject to Husband's appraisal, added up to $52,983.10. In its Amended Judgment, the trial court denied Husband's motion to correct error with respect to the coin collection, finding that Wife had listed values far greater than Husband's appraisal and that the court's valuation of $17,311.95 "was well with[in] the range of values shown by the evidence." Appellant's App. p. 69.

To the extent that Husband argues that the trial court should not have credited Wife's evidence concerning the value of the coin collection, his argument is simply a request to reweigh the evidence and judge the credibility of witnesses, which we will not do on appeal. However, again relying on *Erb,* Husband also argues that the trial court's findings were insufficient to support its valuation of the coin collection because they include no explanation of how the court arrived at the $17,311.95 figure. We agree. Because we are unable to discern from the trial court's findings how it arrived at its valuation of the coin collection, we remand to the trial court with instructions to provide a detailed explanation of how it arrived at the specific value assigned.

We recognize that this court has previously held that a trial court does not abuse its discretion where its valuation of property falls within the range of values supported by the evidence. *See, e.g., Balicki v. Balicki,* 837 N.E.2d 532, 536 (Ind.Ct. App.2005), *trans. denied; Goossens v. Goossens,* 829 N.E.2d 36, 38 (Ind.Ct.App. 2005). However, neither of these cases addressed the specific issue of whether the trial court's findings were sufficient to support its valuation. Moreover, we do not read these cases as giving the trial court unfettered discretion to choose any number out of thin air so long as it falls somewhere within a wide range of values supported by the evidence. In *Goossens,* the trial court valued the asset in question at $90,000, in accordance with Wife's testimony. 829 N.E.2d at 38. And in *Balicki,* it appears that the trial court arrived at its valuation of a business by choosing a "round number" near the high end of the values supported by the evidence. 837 N.E.2d at 536–37. But here, neither party testified that the coin collection was worth $17,311.95, and we cannot glean from the record any basis for the trial court's seemingly arbitrary, yet very precise valuation of the coin collection. Remand is therefore appropriate.

**Conclusion**

The trial court's use of income averaging to calculate Husband's weekly gross income for child support purposes was not clearly erroneous. The trial court did not err in including Son's college account, the $250,000 in early distributions, Account # 0887, or IRA # 1941 within the marital estate. With regard to IRA # 5137, we remand to the trial court with instructions to consider whether it inadvertently double counted a portion of the assets included within the IRA. The trial court did not abuse its discretion in valuing the E*Trade Account or the cash on hand. With regard to the coin collection, we remand to the trial court with instructions to provide a detailed explanation of how it arrived at the specific value assigned to the coin collection.

Affirmed in part, reversed in part, and remanded with instructions.

FRIEDLANDER, J., and MAY, J., concur.